**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH—CENTRAL DIVISION**

| | |
|---|---|
| BEUS GILBERT PLLC,<br><br>Plaintiff/Stakeholder,<br><br>vs.<br><br>BRIGHAM YOUNG UNIVERSITY, WEILIN XIE, DANIEL L. SIMMONS,<br><br>Defendants/Claimants. | **ORDER DENYING THE DONALD L. ROBERTSON TRUST'S MOTION FOR LEAVE TO FILE AMENDED CROSS-CLAIMS AND DENYING BYU'S MOTION FOR STAY**<br><br>Case No. 2:12-cv-00970-RJS<br><br>Chief Judge Robert J. Shelby |
| BEUS GILBERT PLLC,<br><br>Plaintiff/Stakeholder,<br><br>vs.<br><br>DONALD ROBERTSON, BRIGHAM YOUNG UNIVERSITY, WEILIN XIE, DANIEL L. SIMMONS,<br><br>Defendants/Claimants. | |

Before the court are two Motions. First, there is Defendant/Interpleader Claimant The Donald L. Robertson Trust's Motion for Leave to File Amended Cross-Claims.[1] The Trust moves to amend its Cross Claim to assert against Brigham Young University (BYU) claims for breach of contract and misappropriation of trade secrets under Utah law. BYU opposes the Trust's Motion. Second, BYU filed an alternative Motion to Stay the Case Pending Completion of Academic Proceedings involving the Trust's claims, should the court grant the Trust leave to

---

[1] Dkt. 218.

amend.[2]  For the reasons discussed below, the court DENIES the Trust's Motion,[3] and thus

DENIES as moot BYU's Motion to Stay.[4]

## BACKGROUND

This action began as an interpleader seeking the distribution of a fraction of $450 million

BYU received in 2012 after settling a case it had litigated for several years against Pfizer.[5]  That

underlying case arose in the wake of the development of the COX-2 enzyme at BYU between

1989 and 1992.  Pfizer used the COX-2 research to develop the blockbuster drug, Celebrex,

spawning litigation in this court beginning in 2006 between BYU, Pfizer, and others over the

entitlement to Celebrex profits.[6]

In this interpleader action that followed the 2012 BYU-Pfizer settlement, the nominal

Plaintiff was a law firm BYU hired, Beus Gilbert.  The firm sought to allocate a portion of

BYU's settlement funds amongst COX-2's so-called 'developers' who claimed entitlement to

them.  These funds included one million dollars interpled with the court.  The initial interpleader

Defendants were BYU, Dr. Daniel Simmons, and Dr. Weilin Xie.  Simmons was a professor at

BYU and Xie a BYU graduate student when COX-2 was developed.

After early motion practice, BYU determined it was required to complete certain internal

academic procedures related to the distribution of the settlement funds.  The case was stayed for

---

[2] Dkt. 224.  In its briefing opposing the Trust's Motion, BYU also asked the court to acknowledge its subject matter jurisdiction, where it initially asserted subject matter jurisdiction over the interpleader; or to assert supplemental jurisdiction under 28 U.S.C. § 1367.  (Dkt. 219 at 5, n.1.)  The court subsequently requested supplemental briefing on the issue of jurisdiction (Dkt. 223), and BYU, the Trust, and Defendant Xie each submitted briefs.  (Dkts. 227, 228, and 226, respectively.)  Having reviewed that briefing, the court concludes it has diversity jurisdiction over the Trust's proposed Amended Cross Claim; and that in any event, supplemental jurisdiction exercised pursuant to 28 U.S.C. § 1337 is proper for the reasons set forth in BYU's supplemental briefing (Dkt. 228).

[3] Dkt. 218.

[4] Dkt. 224.

[5] *Brigham Young University v. Pfizer,* Civil Case No. 2:06-cv-00890-TS.

[6] *Id.*

a time while parties engaged in those procedures and mediated their disputes. Attendant to that process, the parties also sought, and received, numerous extensions of time for briefing deadlines.

As this case progressed, Beus Gilbert instigated a separate interpleader case against Xie, Simmons, and Dr. Donald Robertson. Robertson had been a biochemistry professor at BYU beginning in 1980 and through the time of COX-2's development. He left the university in 1995.

That later-filed case was consolidated into this action in May 2014.[7] Upon consolidation, Robertson answered Beus Gilbert's Complaint and asserted a Cross Claim for Declaratory Relief against Simmons, Xie, and BYU.[8] Robertson unfortunately then passed away in August 2014. In February 2015, his estate's Trust sought to be substituted into the case[9] and Xie and Simmons filed Motions for Summary Judgment, seeking dismissal of Robertson's Cross Claim for Declaratory Relief.[10] Simmons and Xie had by that time reached a settlement, and the motions pending between them were vacated at their request.

Briefing on the remaining motions to substitute and for summary judgment was complete in October 2015. The court heard argument on the motions on November 16, 2015. At that hearing, the court granted the Trust's Motion for Substitution into the case for Robertson. But the court and other counsel questioned whether Robertson's Cross Claim set forth a cognizable claim, particularly one sounding in contract, as breach of contract appeared to be the primary theory the Trust's counsel advanced at the hearing.[11] In view of that discussion, the Trust's

---

[7] Civil Case No. 2:14-cv-00206 at Dkt. 8.

[8] Dkt. 116.

[9] Dkt. 146.

[10] Dkts. 147 and 179.

[11] Dkt. 216 (Hearing Transcript) at 40-41, 54-57.

counsel asked for "one opportunity to amend" the Trust's Cross Claim to more clearly assert a breach of contract claim against BYU.[12]  The court ruled that the Trust would be allowed to file a motion for leave to amend, the pending Cross Claim would be dismissed, and the multiple motions for summary judgment drawn that Cross Claim would be denied without prejudice.[13]

The Trust subsequently filed a Motion for Leave to File Amended Cross Claims,[14] seeking to assert causes of action against only BYU for breach of contract and misappropriation of trade secrets.  First, in its proposed breach of contract claim, the Trust makes both a primary claim and an "alternative" claim.  In its primary claim, the Trust contends that Robertson, Simmons, and Xie had "employment agreements" with BYU which "included" provisions from BYU's "Intellectual Property Policy as it existed at that time."[15]  The Trust repeatedly refers to a BYU IP Policy "effective from 1989 through 1992 during the development of COX-2"[16]— though this "effective" IP Policy is neither quoted in nor attached to the proposed Amended Cross Claim.  The Trust alleges that under this IP Policy, BYU had a duty to distribute income to those "from whom BYU has claimed ownership of the COX-2 technology."[17]  The Trust separately alleges the "effective" IP Policy "is a valid contract between BYU and Dr.

---

[12] *Id.* at 54.

[13] *Id.* at 59-60.  At that point, Xie's counsel suggested the interpled million dollars should be returned to BYU.  Simmons' counsel, because he was not asserting a claim to the million dollars, expressed no objection.  *Id.* at 62-63.  The Trust's and BYU's counsel eventually agreed they too would not oppose the money's return to BYU.  *Id.* at 63-64.

[14] Dkt. 218.

[15] Dkt. 218-1 at ¶ 11.

[16] *Id.* at ¶ 13.

[17] *Id.* at ¶ 14.

Robertson,"[18] and that BYU breached it in various ways. [19]  Finally, the Trust alleges that Robertson "[a]t all times during his employment at BYU . . . faithfully performed all that was required of him under his employment agreement with BYU, including the BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2."[20]

In an "alternative" breach of contract claim, the Trust alleges a BYU IP Policy that became effective in 2001 (the 2001 IP Policy), six years after Robertson left BYU, but which BYU applied in distributing funds to Simmons and Xie during the pendency of this case—"is a

---

[18] *Id.* at ¶ 27.

[19] *Id.* at ¶¶ 28-32.  Here, but without reference to any contract terms, the Trust alleges BYU engaged in the following conduct in breach of the agreement:

- In paragraph 28, by "claiming ownership of Dr. Robertson's contributions to the COX-2 technology as the property of BYU and failing to distribute COX-2 derived income to Dr. Robertson[;]"

- In paragraph 29, by "failing to recognize Dr. Robertson's contributions to the development of COX-2 under the BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2[;]"

- In paragraph 30, by "failing to notify Dr. Robertson it had received $450 million from Pfizer as part of a settlement of a dispute regarding the development of COX-2[;]"

- In paragraph 31, by "by instructing Beus Gilbert PLLC to distribute: (1) approximately $129 million to Dr. Simmons; (2) $1 million to Dr. Xie; and (3) $1 million to BYU for BYU to hold in reserve, to the exclusion of Dr. Robertson[;]" and

- In paragraph 32, by "by applying the 2001 BYU IP Policy to its determination of which individuals were 'Academic Developers' of COX-2 to the exclusion of Dr. Robertson [instead of the unspecified IP Policy Robertson claims was effective from 1989 through 1992]."

[20] *Id.* at ¶ 15.

contract with Robertson," and that BYU breached it in various ways.[21]  The Trust attaches to its proposed Amended Cross Claim a copy of the 2001 IP Policy,[22] together with four other documents: 1) a BYU IP Policy from the year 1992;[23] 2) a BYU IP Policy from 2000;[24] 3) a letter dated October 24, 2013,[25] from Robertson to Dr. David Bearss at BYU; and 4) a letter dated March 4, 2014, from Robertson's counsel to Dr. Bearss.[26]

Finally, for the first time in this action, the Trust seeks to assert against BYU a claim for misappropriation of trade secrets under Utah's Uniform Trade Secret Act.[27]  The Trust alleges Robertson's contributions to COX-2's development were trade secrets, that they were communicated to persons with duties of confidentiality under BYU's IP Policies —BYU, Simmons, Xie, and others—but that those secrets were disclosed to Monsanto and Pfizer and used to develop Celebrex, eventually leading to the $450 million settlement in 2012.[28]  The Trust

---

[21] *Id.* at 7-8 ¶¶ 33-37.  The Trust alleges that BYU breached the 2001 IP Policy:

- In paragraph 33, by "failing to identify Dr. Robertson as an 'Academic Developer' of COX-2 under that version of the policy[;]"

- In paragraph 34, by "applying the 2001 BYU IP Policy to its apportionment and distribution of COX-2 derived funds from the Pfizer settlement to the exclusion of Dr. Robertson[;]"

- In paragraph 35, by "failing to apportion and distribute COX-2 derived funds to Dr. Robertson from the Pfizer settlement regarding the development of COX-2 under that version of the policy[;]"

- In paragraph 36, by "failing to distribute COX-2 derived funds to Dr. Robertson after Dr. Robertson notified BYU in October of 2013 that he had contributed to the development of COX-2[;]" and

- In paragraph 37, by "failing to distribute COX-2 derived funds to Dr. Robertson after Dr. Robertson's counsel reminded BYU in March of 2014 that Dr. Robertson had contributed to the development of COX-2."

[22] Dkt. 218-1 at 34-59.

[23] *Id.* at 18-33.

[24] *Id.* at 12-17.

[25] *Id.* at 60-64.

[26] *Id.* at 65-67.

[27] Utah Code Ann. §§ 13-24-1, et seq.  There is no statute referenced in the proposed Amended Cross Claim's trade secret claim. (Dkt. 218-1 at ¶¶ 39-44.)  The parties' briefing presumes the Trust's claim is based on Utah's Uniform Trade Secret Act.

[28] Dkt. 218-1 at ¶¶ 40-43.

claims it has been harmed by these actions "because BYU has not compensated Dr. Robertson or the Robertson Trust for its use of the trade secrets."[29]

BYU opposes the Trust's Motion for Leave to Amend on the grounds that the proposed amendments are futile. BYU first argues that the Trust's breach of contract claim fails because the Trust's claim that Robertson had an employment agreement with BYU which incorporated any IP Policy—including one allegedly in effect from 1989-1992—is implausible; and the Trust has not alleged facts showing that Robertson performed and would thus have enforceable rights under the terms of the 1992, 2000, or 2001 IP Policies attached to the proposed Amended Cross Claim. BYU argues with regard to the proposed misappropriation of trade secrets claim that under Utah law, it either did not survive Robertson's passing or is time-barred under the applicable three-year statute of limitations. BYU asks the court to deny the Trust's Motion, and to dismiss its action against BYU with prejudice.

In the alternative, should the court grant the Trust's Motion for Leave to Amend, BYU moves for a six-month stay of this case.[30] BYU seeks the stay to allow for internal academic alternative dispute resolution procedures mandated in both the 1992 and 2001 IP Policies.

The Trust opposes BYU's Motion to Stay.[31] It argues BYU has failed to carry its burden to show that the 1989-1992 BYU IP Policy that the Trust alleges to be the effective contract between Robertson and BYU contained a term mandating alternative dispute resolution. The Trust further argues that because Robertson contributed to the development of COX-2 at BYU from 1989-1992, but left BYU in 1995, he "cannot be said to have assented to the 'mandatory

---

[29] *Id.* at 9 ¶ 44.

[30] Dkt. 224.

[31] Dkt. 220.

alternative dispute resolution process' of the 2001 BYU IP Policy"[32]—a position BYU contends is at variance with Robertson's prior Answer to BYU's Cross Claim in this case, wherein Robertson admitted that in the event developers don't agree to a distribution scheme, "the [2001] Policy sets forth dispute resolution procedures."[33] The Trust offers no argument on any effect of the 1992 IP Policy term mandating alternative dispute resolution.[34]

The court held a hearing on the Trust's Motion for Leave to File Amended Cross Claims and BYU's Motion for Stay on February 18, 2016. The Trust then filed a Notice of Supplemental Authority, further briefing issues discussed at the hearing.[35] BYU responded to the Trust's Notice of Supplemental Authority by filing a Motion to Strike it,[36] and the Trust opposed that Motion.[37] The Trust then filed other motions seeking certain discovery and for a jury trial.[38] At a hearing on June 1, 2018, the court denied BYU's Motion to Strike, and permitted BYU to file a response to the Trust's Supplemental Authority.[39] It also denied the Trust's motion seeking discovery, but granted the Trust's Motion for Jury Trial.[40] BYU filed its response to the Trust's Notice of Supplemental Authority on June 15, 2018.[41]

---

[32] *Id.* at 17.

[33] Dkt. 115 ¶ 25, in its Answer to Dkt. 112 ¶ 25.

[34] Dkt. 220 at 16-17.

[35] Dkt. 230.

[36] Dkt. 231.

[37] Dkt. 232.

[38] Dkts. 233 and 239 (*sealed*).

[39] Dkt. 259.

[40] *Id.*

[41] Dkt. 261.

# DISCUSSION

## I.     The Trust's Motion for Leave to Filed Amended Cross Claims

The determination of whether to permit amendment is governed by Rule 15, Federal Rules of Civil Procedure.  Under Rule 15, leave to amend should freely be given "when justice so requires."  But leave may be denied where amendment would be futile—where the "complaint, as amended, would be subject to dismissal."[42]  Thus, the court evaluates the Motion for Leave to Amend, and BYU's futility arguments, under the general standards it would utilize if evaluating a motion to dismiss for failure to state a claim brought pursuant to Rule 12(b)(6).[43]  Accordingly, the court confines its analysis to an evaluation of the allegations in the proposed Amended Cross Claim and the documents the Trust attaches to it as exhibits.[44]

To avoid being subject to dismissal, the Trust's proposed Amended Cross Claim must comport with Rule 8(a)(2), Federal Rules of Civil Procedure, providing "a short and plain statement of the claim showing that [the Trust] is entitled to relief."  The Rule 8 pleading standard does not "require detailed factual allegations, but it demands more than an unadorned . . . accusation."[45]  A claim offering "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do."[46]  Also insufficient are claims "tender[ing] 'naked assertion[s]' devoid of 'further factual enhancement.'"[47]  Rather, to avoid a finding of futility,

---

[42] *Jefferson County Sch. Dist. v. Moody's Investor's Services*, 175 F.3d 848, 859 (10th Cir.1999).

[43] *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992) (stating "[t]he district court was clearly justified in denying the motion to amend if the proposed amendment could not have withstood a motion to dismiss or otherwise failed to state a claim.") (citations omitted).

[44] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that in considering a complaint's allegations at the motion to dismiss stage, the court may consider the allegations and the "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[45] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (other citations omitted)).

[46] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[47] *Id.* (quoting *Twombly*, 550 U.S. at 557).

the Trust must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" allowing "the court [to] draw the reasonable inference that [BYU] is liable for the misconduct alleged."[48] And while the court generally must accept factual allegations in a proposed claim as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."[49] BYU, as the party opposing amendment, bears the burden to show the proposed Cross Claim does not state such a plausible claim for relief, and that the Trust's amendment is therefore futile.[50]

BYU argues the Trust's proposed Amended Cross Claim is futile because: 1) the Trust has not alleged sufficient facts to state a plausible claim for breach of contract between Robertson and BYU; and 2) the trade secret claim did not survive Robertson's passing—but even if it did, an applicable three-year statute of limitations has expired. As discussed below, the court concludes: 1) the breach of contract claim lacks necessary factual support to rise to the level of plausibility and thus does not withstand BYU's futility arguments; and 2) though the trade secret claim survived Robertson's passing, it is time-barred.

### A. Breach of Contract Claim

Under applicable Utah law, the elements of a prima facie breach of contract claim are: "'(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'"[51] To state a claim showing an entitlement to relief on this cause of action, the Trust must allege facts sufficient to plausibly establish these elements. And though

---

[48] *Id.* (quoting *Twombly*, 550 U.S. at 555-56).

[49] *Twombly*, 550 U.S. at 555.

[50] *See Mackley v. TW Telecom Holdings, Inc.*, 296 F.R.D. 655, 661 (D.Kan. 2014) (citations omitted); *Corporate Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F.Supp.2d 1056, 1060 (D. Colo. 2009).

[51] *America West Bank Members, L.C. v. State*, 342 P.3d 224, 230-31 (Utah 2014) (quoting *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001)).

the nature and quantum of facts will necessarily vary from case to case, the Utah Supreme Court has persuasively explained that "at a minimum, a breach of contract claim must include allegations of when the contract was entered into by the parties, the essential terms of the contract at issue, and the nature of the defendant's breach."[52]

The parties vigorously dispute whether the Trust plausibly alleges the existence of a contract and Robertson's performance. More specifically, BYU argues the proposed breach of contract claim is deficient because although it rests on allegations that Robertson had an underlying employment agreement with BYU and that agreement "included" an IP Policy, it lacks factual allegations to support the claim. As explained below, the court agrees the allegations in the proposed Amended Cross Claim are insufficient to plausibly show the existence and essential terms of the contract Robertson relies upon, and his performance under it.

### 1. There is Insufficient Factual Support to Reasonably Infer the Existence and Essential Terms of a Contract Between BYU and Robertson

Though it is not entirely clear, it appears the Trust in its proposed Amended Cross Claim avers that Robertson had a contract with BYU either because: 1) he had unspecified "employment agreements" with BYU during his work there that "included" any existing BYU IP Policies—including one or more unidentified IP policies presumably in effect between 1989-1992, while COX-2 was developed; or 2) because one or more of the BYU IP Policies were somehow distinct contracts to which Robertson was a party. Under either theory, the proposed

---

[52] *Id.* at 231 (affirming dismissal at the pleading stage of claims for breach of contract and breach of covenant of good faith and fair dealing where the plaintiff's complaint "implie[d] the existence of a contract and a breach of that contract," but contained "no allegations regarding the date when the contract was entered into, the essential terms of the contract, nor the nature of the defendant's breach."); *see also Springfield Finance v. Lilley*, 2016 WL 4275642, at *4 (D.Utah Aug. 12, 2016) (citing *America West Bank Members*, 342 P.3d at 231, and stating that breach of contract plaintiff "must allege when the parties entered into the contract, the essential terms of the contract, and the nature of the defendant's breach.").

Amended Cross Claim fails to set forth sufficient factual support to plausibly establish the existence and essential terms of a contract between BYU and Robertson.

The Trust's allegations on this point are:

- "Dr. Robertson began teaching as a professor of biochemistry at BYU in 1980."[53]

- "At all times during their employment, in particular during the development of COX-2, BYU's employment agreements with Dr. Robertson, Dr. Simmons, and Dr. Xie included the provisions of BYU['s] Intellectual Property Policy as it existed at that time."[54]

- "Different versions of the BYU IP Policy include, but are not limited to: (1) The BYU Intellectual Property and Creative Works Policy – 1992 ("1992 BYU IP Policy," true and correct copy attached as Ex. 1); and (2) Brigham Young University Intellectual Property Policy – 2000 ("2000 BYU IP Policy," true and correct copy attached as Ex. 2); and (3) Brigham Young University Intellectual Property Policy – 2001 ("2001 BYU IP Policy," true and correct copy attached as Ex. 3). The 2000 BYU IP Policy indicates, 'PRIOR VERSION: February 27, 1998.'"[55]

- "Under the IP Policy that was effective from 1989 through 1992 during the development of COX-2, BYU claimed ownership of the COX-2 technology as the property of BYU."[56]

- "Under the IP Policy that was effective from 1989 through 1992 during the development of COX-2, BYU has a duty to distribute income to the individuals from whom BYU has claimed ownership of the COX-2 technology."[57]

- "At all times during his employment at BYU, Dr. Robertson faithfully performed all that was required of him under his employment agreement with BYU, including the BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2."[58]

- "Dr. Robertson left BYU in 1995."[59]

- "The BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2 is a valid contract between BYU and Robertson."[60]

---

[53] Dkt. 218-1 at ¶ 7.

[54] *Id.* at ¶ 11.

[55] *Id.* at ¶ 12.

[56] *Id.* at ¶ 13.

[57] *Id.* at ¶ 14.

[58] *Id.* at ¶ 15.

[59] *Id.* at ¶ 16.

[60] *Id.* at ¶ 27.

- "In the alternative, BYU breached the 2001 BYU IP Policy, which in the alternative is a contract with Dr Robertson, by failing to identify Dr. Robertson as an "Academic Developer" of COX-2 under that version of the policy."[61]

The thrust of these allegations is that Robertson entered into one or more unspecified employment agreement(s) at some unknown point(s) during his time working at BYU from 1980 to 1995; the agreement(s) somehow "included" unidentified provisions from one or more unspecified IP Policies; the IP Policies were somehow "effective" as "contracts"; that BYU had legal duties arising from unspecified terms in the Policies; and that Robertson faithfully performed unspecified terms of whatever agreements or policies formed the basis for a contractual relationship with BYU, including an IP Policy in effect from 1989-1992. These allegations are conclusory and unsupported with facts concerning the formation and essential terms of any contract, whether through an underlying employment agreement or various IP Policies. While no one missing fact may be the lynchpin to this claim, the paucity of any facts concerning the various alleged agreements leads the court to conclude the contract claim is implausible.

First, insofar as the Trust's contract claim rests upon some underlying employment agreement, no such agreement is identified with even the most elemental facts. The Trust provides no factual allegations concerning the fundamental and essential characteristics of the claimed contract, including: when Robertson and BYU entered into such an agreement; how Robertson and BYU formed the agreement; whether the agreement was written or oral (as the Trust suggests in its briefing might be the case); [62] how it became "effective" as the Trust alleges;

---

[61] *Id.* at ¶ 33.

[62] Dkt. 220 at 8 (arguing the statute of frauds would not bar enforcement of a possible oral contract between Robertson and BYU; further noting that the "Trust plead [sic] sufficient facts to draw the reasonable conclusion that Dr. Robertson had an at-will employment agreement with BYU.").

what the essential terms of the agreement were; whether and how terms of one or more IP Polices were "included" in the agreement,[63] and if so, what those terms were.  Given the nature of the Trust's fluid and amorphous contract theory, the answers to some of these questions necessarily implicate other questions that on the facts alleged require answers to provide even the most basic Rule 8 notice to BYU.  Among other things, was there only one employment agreement between Robert and BYU during Robertson's fifteen-year tenure at the school?  If more than one, which one is the Trust relying on for its breach claim?

Second, there is a similarly fatal absence of factual support concerning the two IP Policies the Trust alternatively suggests might contractually bind Robertson and BYU—the 1989-1992 IP Policy or the 2001 IP Policies.  The Trust suggests one or the other Policy is binding either because they are "included" in the underlying employment agreement(s) or somehow serve as stand-alone contracts with Robertson.

Yet, as with the alleged underlying employment agreement(s), the Trust fails to allege the fundamental and essential facts concerning any IP Policy contract, including for example: when Robertson and BYU entered into a contractual relationship under any IP Policy; how any one or more IP Policies came to have the force and effect of a contract between BYU and Robertson; what the essential terms of the contract were; assuming there were also one or more employment agreements between BYU and Robertson (as alleged), whether the IP Policies or specific terms of the IP Policies were incorporated into the employment agreement(s); if so, what Policies or terms were incorporated, and how did subsequent revisions to the underlying

---

[63] And given the complex and long-term nature of the parties' relationship—Robertson's employment as a professor and researcher over fifteen years at a university—there is no way for the court to guess as to the terms the parties might have included in any theoretical agreement—whether it was simply an oral, at-will contract; or written and with conditions concerning class loads, committee assignments, resources available, research requirements, conduct codes, or any number of other terms.

employment agreement(s) and/or IP Policies affect the contractual duties between Robertson and BYU.  Neither are there any factual allegations providing support for the Trust's alternative theory that BYU's 2001 IP Policy, which became effective six years after Robertson retired from BYU, somehow provides a basis for a breach of contract claim.

In its briefing, the Trust contends in a conclusory manner that "it plead [sic] a plausible contract (BYU IP Policy) in effect from 1989- 1992."[64]  But the Trust fails to supply any of the above-mentioned missing factual allegations in the proposed Amended Cross Claim concerning the minimum required elements of a breach of contract claim under Utah law.[65]

Rather, the Trust presents a novel argument: that the formation of Robertson's contract is established by examining BYU's "dealings with Professors Simmons and Xie," which the Trust contends "prove a contract (BYU IP Policy) existed between BYU and its professors in 1989-1992."  The Trust further posits the essential terms of this IP Policy can be discerned by

---

[64] Dkt. 220 at 3.

[65] In its Notice of Supplemental Briefing, the Trust notes it is settled law that university intellectual property policies can contractually bind employees and university employers.  (Dkt. 230.)  This is right as a general principle, but as BYU correctly responds, this cannot save the Trust's proposed Amended Cross Claim even under the supplemental authorities the Trust supplies.  The Trust fails to allege facts showing it has such an enforceable agreement under those cases—facts concerning the "nature and terms of the putative contract, instead asking the Court to 'infer' and speculate about the terms of an academic policy that the Trust speculates to have been in place approximately thirty years ago."  (Dkt. 261 at 4.)  There are simply no facts in the proposed Amended Cross Claim concerning Robertson's knowledge of new proposed policy terms, their application to him, his continued employment after he received communication of the new terms that would apply to him, and his compliance with the terms of any such policy.  Those facts are identified as critical in cases both parties cite in the supplemental briefing.  *See e.g., Fenn v. Yale University*, 283 F.Supp.2d 615 (D. Conn. 2003) (noting that university patent policies are recognized as valid parts of employment contracts; finding professor bound by initial and subsequent express versions of a policy where he agreed he was bound by the first policy, which clearly stated the university could amend it at any time; he continued his employment during the subsequent amendments and continued his work in compliance with the policy) (citing *University of West Virginia Bd. Of Trustees v. VanVoorhies,* 84 F.Supp.2d 759, 769-71 (N.D.W.Va. 2000) (inventor bound by university policy he knew of and with which he previously complied multiple times)); *Charest v. President and Fellows of Harvard College,* 2016 WL 614368, at *11-12 (D.Mass. Feb. 16, 2016) (finding Harvard's IP policy part of the employment agreement despite fact that Harvard retained unilateral right to alter it where professor had signed an express agreement "in which he agreed to be bound by the IP Policy and in which he acknowledged that he understood and accepted the terms of Harvard's royalty sharing policy"—a policy set forth in mandatory terms).  The Trust's cited allegations, which simply state Robertson was a professor from 1980 until he left BYU in 1995, do not perform the work required to show he knew of applicable, specific IP Policy terms; assented to them by continuing his employment; and complied with them with regard to COX-2 or otherwise. (Dkt. 230 at 5 (citing Dkt. 218-1 at ¶¶ 7 and 16.))

reviewing the terms of the other IP Policies actually attached to the Cross Claim—those from 1992, 2000, and 2001. The Trust provides in its briefing citation to no authority supporting its position.[66] The court nonetheless briefly addresses these arguments below.

First, the Trust theorizes that because COX-2 was developed at BYU between 1989-1992, and because in 2012 BYU paid Simmons and offered to pay Xie a portion of the income it had derived from COX-2, it must necessarily be that BYU "[c]learly . . . had a contract [with Simmons and Xie] under the BYU IP Policy . . . ."[67] And in another leap, the Trust argues that "From 1989-1992, a BYU IP Policy must have been in effect as to Professors Simmons and Xie or BYU would have had no basis upon which to assume ownership of COX-2 developments contributed by Professors Simmons and Xie." Because Robertson had also been a BYU professor who contributed to COX-2's development, the Trust asserts "The BYU IP Policy in effect from 1989-1992 for Professors Simmons and Xie is the same policy in effect for Dr. Robertson."[68]

This argument is unsupported by legal authority and requires multiple, impermissible factual leaps. First, the Trust has cited no authority suggesting that the existence of an employment contract, or intellectual property policy contract in an employment setting, can plausibly be inferred under these circumstances. And the court simply cannot, on the allegations in the proposed Amended Cross Claim, infer that a contract between BYU and Xie (the alleged 1989-1992 IP Policy) existed, that it is the reason why BYU in 2012 sought to settle claims to pay Simmons and Xie for assisting in developing COX-2, and then further infer that

---

[66] *Id.* at 4-7.

[67] *Id.* at 5.

[68] *Id.* at 6.

Robertson—who left BYU twenty-seven years before BYU paid Simmons and Xie—necessarily enjoyed the same contract and is owed the same obligations.

Notably, the Trust's inferential reasoning is undermined by the allegation in its own proposed Amended Cross Claim that BYU in fact applied the 2001 IP Policy in its 2012 dealings with Simmons and Xie,[69] not an unspecified Policy from 1989-1992. Assuming the truth of that allegation, it is not plausible that BYU's dealings with Simmons and Xie decades later evidence a contract between Robertson and BYU incorporating or based on a different, unspecified IP Policy or Policies in effect between 1989 and 1992.[70] In short, the Trust has not plausibly alleged Robertson had an enforceable contract with BYU, let alone one somehow evidenced by BYU's dealings with Simmons and Xie.

More fundamentally, the Trust has not plausibly alleged the essential terms of any 1989-1992 IP Policy it purports to rely upon in its breach of contract claim.[71] The Trust now argues the essential terms of this IP Policy can be inferred by examining "subsequent versions of the BYU IP Policy."[72] The Trust claims these IP Policies in effect *after* 1992 "evidence . . . the terms of the contract"[73] and make plausible the Trust's allegation that the earlier 1989-1992 IP Policy required: 1) "ownership of the COX-2 development to transfer from the professors to

---

[69] Dkt. 218-1 at ¶ 32.

[70] And the court would only be left to guess as to why BYU would apply any policy, including the 2001 IP Policy. Perhaps Xie and Simmons were still at BYU long after Robertson left in 1995—the Trust's allegations concerning their tenure at BYU only state when each arrived at BYU—Xie in 1987, Simmons in 1989. (Dkt. 218-1 at ¶¶ 8-9.) There simply are no factual allegations regarding when Simmons and Xie left BYU, or whether they signed an agreement incorporating the 2001 IP Policy at some point.

[71] The Trust in its briefing focuses on the alleged binding nature of only the IP Policy in effect from 1989-1992, foregoing argument in support of its alternative claim that the 2001 IP Policy was somehow a binding contract between Robertson and BYU. But to the extent that the Trust continues to assert that alternative argument, the court has discussed above why the Trust has failed to supply factual support showing plausibly that the 2001 IP Policy was a binding contract between Robertson and BYU.

[72] *Id.*

[73] *Id.*

BYU;" and 2) "BYU to pay the professors a portion of income derived from the COX-2 development."[74]

This argument fails. First, as with the argument concerning BYU's dealings with Simmons and Xie, the Trust cites no legal authority for the proposition that the essential terms of an intellectual property policy can be inferred by examining written versions of policies later effectuated. The Trust also fails to identify which essential terms from these subsequent policies the court should infer as included (or excluded) in the alleged 1989-1992 IP Policy. The speculation the Trust now urges cannot substitute for its obligation to plead facts.

And the terms of an unspecified, possibly oral agreement[75] simply are not made more plausible by looking at later, written versions. This point requires little elaboration. Agreements are altered, terms are included or omitted, because they are found to have been needed but lacking, or included but superfluous in prior versions. There are, for example, notable differences between the 1992 IP Policy and subsequent BYU IP Policies. But even if there were only insignificant differences between the various IP Policies (as, for example, between the 2000 and 2001 IP Policies attached to the proposed Amended Cross Claim), this provides no factual information concerning whether the unspecified IP Policy or Policies "effective" between 1989-

---

[74] *Id.* at 7.

[75] The Trust suggests that the BYU IP Policy in place from 1989-1992 would be enforceable even if it were not in writing, arguing that the statute of frauds "does not require employment agreements, such as the BYU IP Policy, to be in writing." (Dkt. 220 at 7.) The court makes no finding on the statute of frauds issue where there is simply no factual basis for the formation of any contract, oral or written. It is notable, however, that the Trust has not alleged in its proposed Amended Cross Claim whether the agreement it relies upon was in fact oral or written, and does not actually illuminate in its briefing on the statute of frauds issue whether the agreement it is relying upon was in fact oral or written. Rather, it simply states that it has sufficiently alleged that Robertson's employment agreement was "at-will"—a detail which is not mentioned anywhere in the proposed Amended Cross Claim—and that "[b]ecause Dr. Robertson's employment with BYU could have terminated in less than one year, the Utah Statute of Frauds does not require the BYU Policy in effect from 1989-1992 to be in writing." (Dkt. 220 at 8) citing Utah Code Ann. § 25-5-4).

1992 on the one hand, and the 1992 IP Policy on the other, were identical, similar in some ways, or wholly different—and as to what terms.[76]

Based upon the foregoing, the court concludes that the Trust has not plausibly alleged the existence and essential terms of a contract between Robertson and BYU. The Trust's conclusory allegations concerning an "effective" IP Policy, and unspecified terms somehow "included" in other unspecified "employment agreements" are insufficient. And the court declines the Trust's invitation to infer the existence of a binding contract and its terms based on BYU's dealings with Simmons and Xie and later-promulgated IP Policies. The Trust has failed to plausibly allege the first element of its breach of contract claim—that Robertson had a contract with BYU.

### 2. There is Insufficient Factual Support to Reasonably Infer Robertson Performed as Required under any Contract with BYU

Likewise, the Trust has failed to allege plausibly the second element of its breach of contract claim, Robertson's performance. Paragraph 15 of the proposed Amended Cross Claim supplies the Trust's sole allegation clearly drawn to the nature or sufficiency of Robertson's performance:

> At all times during his employment at BYU, Dr. Robertson faithfully performed all that was required of him under his employment agreement with BYU, including the BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2.[77]

---

[76] By way of illustration, the Trust's arguments in opposing BYU's Motion to Stay underscore that the terms of subsequent contracts cannot, on the allegations before the court, be read into any unspecified IP Policy effective from 1989-1992. The Trust's opposition to BYU's Motion to Stay rests largely on an argument that the terms of the 1992 and 2001 IP Policies *cannot* be read into the unspecified IP Policy effective from 1989-1992. BYU seeks to stay this action, if the court were to permit the Trust to amend, so that the internal academic procedures delineated in both the 1992 and 2001 IP Policies can be exhausted. The Trust responds that while BYU "argues both the 1992 and 2001 versions of the BYU IP Policy contain mandatory alternative dispute resolution processes," it "has not alleged, much less provided evidence, that the BYU IP Policy in effect from 1989-1992 contained" such a provision. (Dkt. 220 at 17). Thus, the Trust argues, Robertson "cannot be said to have assented to" the processes identified in the 2001 IP Policy. *Id.*

[77] Dkt. 218-1 at ¶ 15.

This lone, conclusory allegation amounts to no more than a "formulaic recitation of [an] element[]" of a breach of contract claim.[78]  In the context of the Trust's proposed Amended Cross Claim, it is insufficient to plausibly establish Robertson's performance.  Removing it from consideration, there are no factual allegations in the proposed Amended Cross Claim identifying the terms in any agreement describing what was required of Robertson, or the actions he took to comport with those terms.  There may be instances in which no more is required to adequately plead contract performance, but here, viewing the proposed Amended Cross Claim in its entirety – including the lack of facts concerning what contract is claimed or any of its terms – the Trust's conclusory allegation that Robertson did "all he was required to do" falls short of plausibly pleading contract performance.

And independently mining the proposed Amended Cross Claim for allegations concerning *any* actions by Robertson both during and after his time at BYU does not help the Trust plausibly establish Robertson's performance under any contract.  Additional allegations establish only that while Robertson was at BYU, he worked as a biochemistry professor beginning in 1980, chaired BYU's Biochemistry Section in 1989, had a graduate student in his laboratory (Xie) who in 1989 "began working on the COX-2 collaborative research project with Dr. Simmons," "contributed to the COX-2 development,"[79] "communicated" with BYU concerning COX-2,[80] and left BYU in 1995.[81]  The allegations concerning his conduct after he left BYU are that Robertson was called to testify before a BYU committee tasked with dividing

---

[78] *Twombly*, 550 U.S. at 555.

[79] *Id.* at ¶ 40 (included in the claim for misappropriation of trade secrets).

[80] *Id.* at ¶ 41 (included in the claim for misappropriation of trade secrets).

[81] *Id.* at ¶¶ 7, 9, and 16.

BYU's settlement funds between Simmons and Xie.[82]  Then, in October 2013 and again in

March 2014, he advised BYU that he believed he was a developer of COX-2 technology.[83]

Though the Trust now argues in its briefing that these allegations show "Dr. Robertson

performed under the contract by contributing to the development of COX-2 and allowing BYU

to assume ownership of his developments,"[84] none of Robertson's actions are alleged as conduct

undertaken to fulfill his performance obligations under any contract.[85]  The Trust has failed to

plausibly allege the performance element of the breach of contract cause of action.

## B.  Misappropriation of Trade Secrets Claim

BYU contends the Trust's proposed claim for misappropriation of trade secrets fails on

two grounds.  First, BYU argues that under Utah's Survival Statute, Utah Code Annotated §

---

[82] *Id.* at ¶ 23.

[83] *Id.* at ¶¶ 24-25.

[84] Dkt. 220 at 6 (citing Cross Claim (Dkt. 218-1) at ¶¶ 7-9, 15, 23-25, 40-42).

[85] In the interest of completeness, the court notes that several arguments in the parties' briefing were immaterial to the court's evaluation of the sufficiency of the proposed Amended Cross Claim.  First, BYU cites in a footnote testimony Robertson offered in 2011 in which he states he had no ongoing financial relationship with BYU and that COX-2 was Simmons' discovery, to which he had no claim.  (Dkt. 19 at 10, n.4.)  The Trust objects to the court's consideration on the grounds the court already determined that issue in the Trust's favor when it denied Simmons' and Xie's motions for summary judgment.  The court finds that such deposition evidence, arguably extraneous from the pleadings (though Robertson's own October 24, 2013 letter attached to the Cross Claim refers to the deposition (Dkt. 218-1 at 63)), is likely not properly before the court for consideration at this stage.  But the Trust's view of the procedural history of the summary judgment is misplaced, as BYU notes in its briefing.  Those motions for summary judgment were denied not on their merits, but because they were drawn to the Robertson's/the Trust's prior Cross Claim, which the court dismissed.  (*See* Dkts. 215, Order; and 216 at 59, Transcript of the November 16, 2015 hearing.)  Second, BYU contends in its briefing that the Trust is simply incorrect in its allegations that BYU could not own the intellectual property of its employees absent a duty to distribute funds back to them, because "BYU and its employees are governed by the 'work for hire' doctrine as . . . part of their relationship, and BYU's adoption of IP Policies is a generous act, not required by law."  (Dkt. 219 at 9.)  The work for hire doctrine may be a possible defense relevant to BYU in this action, but it does not directly affect the court's analysis of whether the Trust has plausibly alleged in its proposed Amended Cross Claim the existence of a contract between Robertson and BYU.  Third, in an effort to show that "Simmons, Xie, and Robertson . . . fully appraised [BYU] of the COX-2 research before any public disclosures were made" (Dkt. 220 at 11), the Trust cites to various documents that are not attached to its Motion for Leave to File Amended Cross—research articles and Robertson's deposition.  Just as it will not consider extraneous evidence submitted by BYU, the court will not consider these articles and deposition testimony the Trust offers, particularly where no party has moved the court to convert the briefing before it to be considered under summary judgment standards.  *See* FED.R.CIV.P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

78B-3-107, the claim did not survive Robertson's death in August 2014. Second, BYU urges that even if the claim survived, it is time-barred under Utah's Uniform Trade Secrets Act, Utah Code Annotated § 13-24-1. The court concludes the trade secret claim survived Robertson's passing, but finds the claim is time-barred.

### 1. The Misappropriation of Trade Secrets Claim Survived Robertson's Death

BYU first argues the claim for misappropriation of trade secrets did not survive Robertson's passing because a "trade secret claim does not fit within Utah's survival statute," which BYU contends permits survival only of tort claims for personal injury to the person.[86] Because "[n]o personal injury claim is asserted," BYU argues the trade secret claim necessarily extinguished upon Robertson's death. But BYU fails to address whether a trade secret claim survives death under the common law—obviating the need for reliance on the survival statute. A review of Utah law on survival of claims leads the court to conclude Robertson's trade secret claim survived his death.

At common law, some tort claims survived the death of the claimant or tortfeasor, while others did not. "Personal" tort actions for injuries to the person—"'such as assault, battery, false imprisonment, [and] slander'"—abated on death.[87] But "tort claims for property damage or conversion survive[d]."[88] "The rationale for this distinction is 'that the reason for redressing purely personal wrongs ceases to exist either when the person injured cannot be benefited by a recovery or the person inflicting the injury cannot be punished, whereas, since the property or

---

[86] Dkt. 219 at 15.

[87] *Gressman v. State*, 323 P.3d 998, 1001 (Utah 2013) (quoting *Mason v. Union Pac. Ry. Co.,* 7 Utah 77, 24 P. 796, 796 (Utah Terr.1890)).

[88] *Id.* (citing *Morrison v. Perry,* 140 P.2d 772, 781–82 (Utah 1943)).

estate of the injured person passes to his personal representatives, a cause of action for injury done to these can achieve its purpose as well after the death of the owner as before.'"[89]

Utah's Survival Statute, Utah Code Annotated § 78B-3-107, abrogates the common law rule to permit the survival of personal injury actions that would otherwise have abated under the common law even if the claimant or tortfeasor dies:

> A cause of action arising out of personal injury to a person, or death caused by the wrongful act or negligence of a wrongdoer, does not abate upon the death of the wrongdoer or the injured person. The injured person, or the personal representatives or heirs of the person who died, has a cause of action against the wrongdoer or the personal representatives of the wrongdoer for special and general damages, subject to Subsection (1)(b).[90]

BYU incorrectly argues that a claim outside Utah's Survival Statute—i.e., a claim other than for injury "to a person"—must be dismissed upon the passing of the claimant or tortfeasor. This is not so. A claim outside the Survival Statute is simply not subject to its terms, including its abrogation of the common law abatement of personal injury actions and its limitation in certain circumstances of the potential damages available when a personal injury claimant dies of causes unrelated to the personal injury.[91] The relevant question for such a claim becomes merely whether the claim would survive death under the common law—rendering superfluous any survival statute analysis.

---

[89] *Id.* (quoting *Barnes Coal Corp. v. Retail Coal Merchs. Ass'n,* 128 F.2d 645, 649 (4th Cir. 1942)).

[90] Utah Code Ann. § 78B-3-107 (1)(b) provides:

> If, prior to judgment or settlement, the injured person dies as a result of a cause other than the injury received as a result of the wrongful act or negligence of the wrongdoer, the personal representatives or heirs of the person have a cause of action against the wrongdoer or personal representatives of the wrongdoer for special and general damages which resulted from the injury caused by the wrongdoer and which occurred prior to death of the injured party from the unrelated cause.

[91] *See Estate of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of Midwest*, 106 P.3d 700 (Utah 2004) (finding deceased insured's claim for underinsured motorist benefits was one based in contract, not personal injury; the claim therefore was not governed by, and recovery could not be limited under, the Survival Statute).

BYU's argument presumes a trade secret claim is not a claim for personal injury. This appears to be correct, as the Trust argues in its Reply Memorandum in Support of Motion for Leave to File Amended Cross Claims.[92] Where this is so, Utah's Survival Statute has no application to the Trust's trade secret claim. This is because, as noted above, claims for property damage or conversion survive under the common law, and require no survival statute to remedy any injustice resulting from the claimant's or tortfeasor's death. And BYU offers no authority to suggest that under the common law, a trade secret claim would not survive death for the same reason a claim for property damage or conversion would.

The sole case BYU cites on the survival issue, *Allred v. Soloray, Inc.*,[93] fails to advance BYU's position. In *Soloray,* the court grappled with whether claims brought under the Americans with Disabilities Act survive the death of the claimant. It concluded they do not, noting the ADA contains no provision addressing survival of claims.[94] The court next considered whether the claims would nevertheless survive under the common law, concluding they would not, as they are penal in nature, and claims for penalties "abate[] upon the death of the plaintiff."[95] Where the claim would have abated at common law, the court next evaluated whether Utah's Survival Statute would save the ADA claims. It interpreted the statute to permit survival only of personal injury claims for injuries to the person—i.e., physical injuries—"as opposed to [the plaintiff's] claims for injury to his rights, reputation or property."[96] For those reasons, the court dismissed the ADA claims.

---

[92] Dkt. 220 at 14-15.

[93] 971 F.Supp. 1394 (D.Utah 1997).

[94] *Id.* at 1396.

[95] *Id.* (citations omitted).

[96] *Id.* at 1398.

In short, the *Soloray* court concluded the claims at issue there would have abated under common law, thus requiring an applicable survival statute to avoid dismissal. BYU offers no common law analysis of the trade secret claim at issue here; and in any event, the trade secret claim appears akin to one for property damage or conversion, rather than one for personal injury.

BYU has not established the Trust's proposed trade secret claim abated under the common law. The Trust has persuasively argued it would not. Where this is so, the Survival Statute provides no grounds for dismissal of the claim.

### 2. The Misappropriation of Trade Secrets Claim is Time-Barred

In its proposed claim for misappropriation of trade secrets, the Trust alleges Robertson's contributions to COX-2's development were trade secrets, that these secrets were communicated to persons owing confidentiality duties under BYU's IP Policies —BYU, Simmons, Xie, and others—but that those secrets were nevertheless disclosed to Monsanto and Pfizer in their development of Celebrex, leading to the $450 million settlement in 2012.[97] The Trust claims BYU has not paid Robertson or the Trust for this use of the trade secrets.[98]

BYU argues the claim—proposed in December 2015—is time-barred under the three-year statute of limitations set forth in Utah's Uniform Trade Secret Act, Utah Code Annotated § 13-24-1, et seq. "While the statute of limitations is an affirmative defense," application of a limitation period "may be appropriately resolved on a [Rule] 12(b)(6) motion" when "dates given in the complaint make clear that the right sued upon has been extinguished . . . ."[99]

---

[97] Dkt. 218-1 at ¶¶ 40-43.

[98] *Id.* at 9 ¶ 44.

[99] *Aldrich v. McCullough Properties, Inc.*, 627 F.2d 1036, 1044 n.4 (10th Cir. 1980) (citing 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357, at 606-08 (1969) (other citations omitted)).

Utah's Uniform Trade Secret Act provides three years within which to bring a claim for trade secret misappropriation:

> An action for misappropriation shall be brought within three years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. For purposes of this section, a continuing misappropriation constitutes a single claim.[100]

The "misappropriation" triggering the statute of limitation is the improper acquisition, disclosure, or use of the trade secret:

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) used improper means to acquire knowledge of the trade secret; or
>> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>
>>> (A) derived from or through a person who had utilized improper means to acquire it;
>>> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[101]

Under these provisions, Robertson/the Trust had three years from when Robertson discovered, or by the exercise of reasonable diligence, should have discovered, BYU's improper acquisition, use, or disclosure of his contributions to the development of COX-2—the alleged trade secret.

---

[100] Utah Code Ann. § 13-24-7.

[101] Utah Code Ann. § 13-24-2.

The Trust's proposed Amended Cross Claim does not allege a specific date when such misappropriation occurred. BYU nevertheless argues the allegations in the proposed Amended Cross Claim establish that Robertson discovered, or should have discovered, any alleged trade secret misappropriation well before December 2012—three years before the Trust first proposed its Amended Cross Claim. A careful review of the proposed Amended Cross Claim, including the documents the Trust attaches to it, reveals this to be correct.

The Trust alleges COX-2 was developed at BYU between 1989 and 1992[102] with contributions Robertson made before he left BYU in 1995.[103] The Trust alleges Robertson's contributions were trade secrets, and were "communicated to BYU by himself" and others, and that "all such persons were under duties of confidentiality" imposed by the "BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2."[104] But BYU disclosed Robertson's contributions to "Monsanto/Pfi[z]er, wherein the trade secrets were used to develop the blockbuster drug Celebrex."[105] Robertson then participated in ensuing litigation between BYU and Pfizer concerning this development.[106] He was deposed in that litigation and displayed knowledge of the underlying science "because he had participated in the research at the time that the COX-2 discovery was being made."[107]

The BYU-Pfizer case settled sometime before May 2012, and "BYU's counsel, Beus Gilbert, PLLC, received $450 million from Pfizer . . . ."[108] After BYU paid its counsel and its

---

[102] Dkt. 218-1 at ¶ 10.

[103] *Id.* at ¶¶ 16, 40.

[104] *Id.* at ¶¶ 40-41.

[105] *Id.* at ¶ 42.

[106] *Id.* at Exhibit 4 (letter dated October 24, 2013 from Robertson to Dr. David Bearss at BYU).

[107] *Id.*

[108] *Id.* at ¶¶ 17-18.

litigation expenses, $290 million remained.  BYU retained 55% of this, and decided to distribute the remaining 45% to those who were "developers" of COX-2.[109]

To that end, BYU in May 2012 created a committee to determine who should properly be considered developers entitled to share in those remaining settlement funds.[110]  BYU then scheduled a meeting on June 6, 2012, to award developer status—but the only potential developer invited was Simmons.[111]  Robertson was not invited.[112]  It was determined at that meeting that Robertson would not be awarded developer status.[113]  Rather, only Simmons and his research assistant, Xie, were awarded developer status at the June 2012 meeting.[114]  That month, BYU instructed its law firm, Beus Gilbert, to distribute the developer funds amongst Simmons and Xie, but to reserve one million dollars in the event that additional developers claimed an interest in the funds.[115]  Xie initially refused to agree to the proposed distribution proportions; and this interpleader action was filed in October 2012.[116]  All of these events predate December 2012—the three year mark before the Trust proposed its Amended Cross Claim asserting a trade secret misappropriation claim.[117]

---

[109] *Id.* at ¶ 17.

[110] *Id.* at ¶ 18.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.* at ¶ 19.

[116] *Id.* at ¶¶ 20-21.

[117] The Trust does not raise or offer argument on the issue of whether the trade secret claim relates back to the filing of Robertson's original Cross Claim under Rule 15(c), Federal Rules of Civil Procedure.  For this reason, the court does not address the issue.

This case was stayed in September 2013 to permit exhaustion of BYU's internal academic procedures. Subsequently, Robertson on his own and then through counsel wrote to BYU claiming he had helped to develop COX-2.[118]

As BYU correctly argues, the Trust's own allegations concerning Robertson's active participation in the BYU-Pfizer litigation before it resolved in May 2012 leads to the plain conclusion that he either knew or with the exercise of reasonable diligence should have discovered that his alleged trade secrets—his contribution to COX-2—had been disclosed and had been commercialized. He was deposed in that litigation, and explained in subsequent correspondence that he had been capable in the deposition of showing in-depth knowledge of COX-2 science, because he had been involved in its development.

In response, the Trust does not address BYU's argument concerning Robertson's deposition, his own description of it, or whether in light of it reasonable diligence would have caused Robertson to discover that his COX-2 contributions had been disclosed.[119] Rather, the Trust recites only what it contends to be Robertson's actual knowledge, noting that he "did not discover that BYU had used his COX-2 development contributions to obtain income from Pfizer until he was called to testify at the BYU Subcommittee shortly before [he] advised BYU of his claim to developer funds."[120]

The Trust's response ignores that "the statute of limitations on trade secret misappropriation claims begins to run . . . simply when the plaintiff has knowledge of sufficient

---

[118] *Id.* at ¶¶ 22-25, Exhibits 4 and 5.

[119] Dkt. 220 at 15-16 (the Trust's response to BYU's statute of limitations argument).

[120] *Id.* (citing Robertson's letter to BYU dated October 24, 2013 that is attached as Exhibit 4 to the proposed Amended Cross Claim).

facts from which a reasonable jury could infer misappropriation."[121]  In other words, the Trust is silent concerning when the misappropriation, in the "exercise of reasonable diligence, should have been discovered."[122]  As noted above, the Trust's own allegations establish Robertson was aware at the time of the BYU-Pfizer litigation that the COX-2 contributions that he considered to be trade secrets had been commercialized and were at issue in the litigation.  On the facts alleged, no reasonable jury could conclude the exercise of reasonable diligence would have failed to cause Robertson to discover what he viewed as trade secret misappropriation before the case resolved in May 2012—more than three years before the Trust proposed its Amended Cross Claim.  Thus, the claim for misappropriation of trade secrets is time-barred and is dismissed.

## II.     BYU's Motion to Stay

BYU has filed an alternative Motion to Stay.[123]  BYU asks that if the Trust's Motion for Leave to Amend is granted, the court stay this action pursuant to mandatory terms in its 1992 and 2001 IP Policies requiring internal dispute resolution.  Because the court has denied the Trust's Motion for Leave to Amend, the Motion to Stay is moot, and therefore denied.

## CONCLUSION

Based on the foregoing, the court HEREBY ORDERS as follows:

1.  The Trust's Motion for Leave to File Amended Cross Claims[124] is DENIED with

    prejudice on the basis that the proposed amendment is futile; and

---

[121] *Chasteen v. Pacer Ind., Inc.*, 216 F.3d 1212, 1218 (10th Cir. 2000) (evaluating Colorado's trade secret statute, which is materially similar to Utah's, providing that "[a]n action for misappropriation of a trade secret shall be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim." Colo. Rev. Stat. § 7–74–107)).

[122] Utah Code Ann. § 13-24-7.

[123] Dkt. 224.

[124] Dkt. 218.

2. BYU's Alternative Motion for a Stay[125] is DENIED as moot.

SO ORDERED this <u>11th</u> day of <u>February</u> 2019.

BY THE COURT:

Chief Judge Robert J. Shelby

---

[125] Dkt. 224.