**Arbitration Decision in the Matter of Donald L. Robertson Trust v. Brigham Young University, December 12, 2025**

**BACKGROUND**
I. The Parties
II. The COX-2 Discovery
III. The BYU/Monsanto Agreement
    A.  The 3T3 cells
    B.  The RS-2 cells
    C.  The BYU/Monsanto agreement termination
IV. The BYU/Pfizer Litigation
V. The BYU IP Developer Committees
VI.  Robertson's Developer Claim
VII. The BYU/Robertson Arbitration

**DISCUSSION**
I. The Trust has Not Established that Robertson Performed Under the Policy by Contributing to the COX-2 Invention
    A.  Robertson's alleged contributions to the sequencing of the COX-2 gene
        i.  Roberston's alleged contribution of a 5' race procedure
        ii. Roberston's alleged contribution to the unspliced intron hypothesis
    B.  Robertson's alleged contribution to a COX Testing System
        i.  Roberston's alleged contribution to the COX-1 selective 3T3 cells
        ii.  Roberston's alleged contribution to the COX-2 selective RS-2 cells
II. The Trust has Not Established that Robertson Performed Under the Policy by Timely Disclosing his Alleged Contributions to the COX-2 Invention to the Relevant Parties
III. The Trust has Not Established that BYU Breached the Policy
    A.  BYU's investigation of COX-2 developers and its distribution of funds to Simmons and Xie
    B.  BYU's reliance on the 2001 IP Policy
    C.  BYU's initiation of an interpleader action in federal court
    D.  BYU's conduct as to Xie
IV. Damages

**CONCLUSION**

**Attorneys and Law Firms**

The Donald L. Robertson Trust (Robertson Trust) by R. William Beard, Jr., Truman H Fenton, Slayden Grubert Beard (SGB), Austin, TX, for Plaintiff.

Brigham Young University, by Robert S. Clark, Parr Brown Gee & Loveless, Salt Lake City, UT; Stephen Craig, David Andersen, University General Counsel, Provo, UT; and Chad Pearson, Kunzler Bean & Adamson (KBA), Salt Lake City, UT, for Defendant.

# BACKGROUND

The present case involves an arbitration proceeding between Donald L. Robertson (Robertson), the claimant, and Brigham Young University (BYU), the respondent, regarding Robertson's status as an intellectual property developer and his claim to portions of the settlement funds awarded to BYU in 2012 pursuant to the 2006-2012 BYU v. Pfizer COX-2 litigation. The governing policy in this dispute is BYU's 1992 Intellectual Property Policy (Policy). The Policy provides that in the event of a dispute involving developers or the University that cannot be resolved through informal discussions, an arbitration panel will be constituted and an arbitration hearing held to resolve the dispute (1992.00.00 BYU IP Policy, 3-4 (Dispute Resolution)). Pursuant to the Policy, the present arbitration panel (Panel) was constituted in the Spring of 2024 and an arbitration hearing (Hearing) held on January 30-31, 2025.

## I.    The Parties

Robertson taught in BYU's Department of Chemistry and Biochemistry between 1980 and 1995 and shared lab space, equipment, materials, fiscal resources, and graduate student support—specifically, student Weilin Xie (Xie)—with faculty member Dr. Daniel L. Simmons (Simmons) (*See* 1990.09.01 BYU Accounting Reports of DLR, 1; 1991.04.16 DLS to DLR–no collaboration (ROBERTSON 003857-003859)).[1] Simmons was hired by BYU in 1989 and was involved in the discovery of the COX-2 gene (1988.03.21 DLS Application Letter to DLR, 1; 1989.10.19 DLS Disclosure Letter to EW (ROBERTSON 001464-004169, 2)).

Robertson received his B.S. from the BYU Department of Chemistry in 1972 and his Ph.D. from the Washington University Medical School, Department of Biological Chemistry in 1976. Robertson was a Junior and Senior Research Fellow at the American Cancer Society, California Division, from 1977 to 1980. In 1980, Dr. Robertson began teaching as an Assistant Professor in the Department of Chemistry and Biochemistry at BYU. In 1985, he was promoted to Associate Professor, and in 1993, he was appointed Full Professor. In 1995, Robertson left BYU to teach chemistry at colleges in Southern

---

[1] Citations in the format XXXX.XX.XX refer to exhibit numbers in the Combined Exhibits folder shared with the Panel.

California, where he remained until his death in August 2014. The Robertson Trust (Trust) is the successor-in-interest and substituted party for Dr. Donald L. Robertson.

Brigham Young University is a Utah nonprofit corporation and an educational institution of higher learning, with its primary place of business in Provo, Utah. BYU was founded in 1875 and most recently reports 35,743 daytime students. It offers 198 undergraduate majors, 96 master's programs, and 30 doctoral programs. The Department of Chemistry at BYU, where the COX-2 intellectual property was developed, was established in 1920 and underwent further development in 1921, 1954, and 1973. It was subsequently disbanded in 1995 to become the Department of Chemistry and Biochemistry.

In 1989, Robertson was the Chair of the Graduate Section of Biochemistry in his department at BYU when he began discussions with Simmons, who was then at Harvard, about his potential employment at BYU (1988.03.21 DLS Application Letter to DLR, 1).

Simmons obtained bachelor's (1978) and master's (1980) degrees in zoology from BYU. In 1986, Simmons earned a Ph.D. in oncology from the University of Wisconsin. From late 1986 through 1989, while a post-doctoral fellow at Harvard University, Simmons initiated a project to characterize cancer-associated immediate-early genes. Simmons generated several chicken embryo fibroblast (CEF) clones with the assistance of Harvard undergraduate student Dan Levy (1988.04.13 Levy Thesis, 2-3). In July 1989, Simmons was hired by BYU as an Assistant Professor in the Department of Chemistry. Simmons brought the CEF clone research he developed at Harvard with him to his new faculty position at BYU (1989.10.19 DLS Disclosure Letter to EW (ROBERTSON 001464-004169, 1)).

Soon after Simmons arrived at BYU, Robertson, who was working on an anthrax project with his graduate student, Weilen Xie (1989.06.26 Robertson Report on Research, 1), recognized that he would quickly reach the end of the project's funding and approached Simmons, suggesting that he involve Xie in his research project (1992.03.12 DLR Recommendation of Dr. Xie, 1; 2024.07.05 Robertson Arbitration Claim, 3). Robertson, Xie, and Simmons agreed that Xie would work on Simmons's project (1992.03.12 DLR Recommendation of Dr. Xie, 1). Xie was Robertson's graduate student and worked in Robertson's laboratory (1991.08.26 DLR to DLS). However, Simmons supervised Xie's work on Simmons's projects (1991.08.27 DLS Letter to DLR (I take full credit (ROBERTSON 003855-003856)). Simmons retired from BYU in 2017.

Dr. Weilin Xie obtained a bachelor's degree in chemistry (1983) and a master's degree in biochemistry (1986) from Shandong University. Subsequently, Xie worked at China's National Institute for the Control of Pharmaceutical and Biological Products. In the fall of 1987, Xie enrolled in BYU's Ph.D. program in Chemistry and Biochemistry. By 1989, Xie had completed his coursework and initially worked with Dr. Marvin Smith, characterizing the mitochondrial DNA of safflower. Next, Xie worked with Dr. Donald

Robertson on research related to anthrax (1989.06.26 Robertson Report on Research, 1). In July 1989, Xie began working on Simmons's project in Robertson's lab (1992.03.12 DLR Recommendation of Dr. Xie, 1). In August 1991, Xie's Ph.D. dissertation was approved by BYU. Xie was the first BYU biochemistry Ph.D. student to finish his degree in four years (*Id.*). Xie left BYU in 1992.

## II.    The COX-2 Discovery

Simmons brought the CEF clone project he was directing at Harvard to BYU and continued working on it at BYU (1989.10.19 DLS Disclosure Letter to EW (ROBERTSON 004164-004169, 1-2)). Within three months of his arrival, Simmons's and Robertson's graduate student Xie, continuing this project, discovered the primary elements of the COX-2 gene (*Id.*, 2). On October 19, 1989, Simmons wrote a letter of discovery to Earl Woolley, the Chairman of the Chemistry department at BYU, describing the discovery that would lead to the eventual identification of the COX-2 gene (*Id.*, 1-3). The letter declared that he and Xie had sequenced the CEF-147 clone and recognized characteristics in it that could have a significant impact on the human pain, fever, and inflammation medication industry (*Id.*). In late 1990, Simmons and Xie completed sequencing the gene that expressed COX-2 (CEF 147) (1990.10.01 Xie Lab Notebook (Oct. 1990 to Feb. 1992), 31)); on December 26th, 1990, they submitted their findings for publication (1991.04.00 PNAS Article, 1).

In April 1991, these findings, in a manuscript titled "Expression of a mitogen-responsive gene encoding prostaglandin synthase is regulated by mRNA splicing," were published in the *Proceedings of the National Academy of Sciences* (PNAS), the peer-reviewed journal of the National Academy of Sciences (1991.04.00 PNAS Article). The manuscript described the development of a fully spliced CEF-147 mRNA, which formed the foundation for the discovery of COX-2 (*Id.*). Xie was listed as the first author and Simmons as the last author on this publication (*Id.*, 1). Robertson and two others were also listed as authors (*Id.*). With scientific manuscripts, first authors are usually those that performed the research and last authors are those that supervised the research, and this ordering reflects the responsibilities listed in the PNAS paper (*See* 2025.01.30 Arbitration Transcript, 174, 179-80). Middle authors play minor roles in research and supervision (*Id.*).

## III.    The BYU/Monsanto Agreement

Following the COX-2 discovery, in February 1991, Simmons contacted Synphar and Monsanto as potential industrial collaborators for the development of selective nonsteroidal anti-inflammatory drugs (NSAIDs) (2012.06.06 Meeting Minutes from 6.6.12, 7). On April 5, 1991, at Monsanto's request, Simmons shared his findings with the company and proposed a collaboration to develop a selective NSAID (1991.04.05 Simmons Research Proposal to Monsanto). In July 1991, at Simmons's request, William Bradshaw (BYU Chemistry faculty) interfaced with Monsanto by providing them with

COX-2 materials and answering questions about them (2013.06.22 Bradshaw Declaration, 5-6). Between April and July 1991, Simmons transferred the COX-1 and COX-2 clones, COX-2 antibodies, and Bassin 3T3 cells to Monsanto (2025.01.31 Arbitration Hearing Transcript, 39-40). On July 8, 1991, BYU and Monsanto executed a research agreement (1991.07.09 Hardman Memo).

A.  The 3T3 cells

On February 10, 1991, Simmons and Xie discovered that Bassin 3T3 cells, previously obtained by Simmons from Dr. Robert Bassin at the NIH, expressed elevated levels of COX-2 (2025.01.31 Arbitration Hearing Transcript, 34-35). Nine days after this discovery, on Feb 19, 1991, Roberston received a separate line of 3T3 cells from Dr. Mark Smith at the NIH (1991.02.19 Mark Smith letter to DLR (Trust Claim Exh 8)).

B.  The RS-2 cells

In October 1991, Dr. Mark Smith (from the NIH) sent RS-2 cells to Robertson at Robertson's request (1991.10.08 Mark Smith Letter to DLR (Trust Claim Exh. 8)). Robertson also requested materials from Simmons to test the RS-2 cells' potential for COX-2 expression (2025.01.31 Arbitration Transcript, 64-65). Simmons refused Roberston's request (*Id.*), but Simmons did provide these materials to Xie, who found the RS-2 cells also express COX-2 (*Id.*, 113). The idea and outcome of the RS-2 experiments, but not the details, were shared with Monsanto in March 1992 (1992.03.20 Simmons letter to Needleman, 2)**.**

C.  The BYU/Monsanto agreement termination

Unbeknownst to Simmons and BYU, between January and March 1992, Monsanto evaluated the compound DUP-697 for COX-2 selectivity using Simmons's provided materials (2025.01.31 Arbitration Transcript, 43), which eventually led to the invention of Celebrex, a COX-2 selective NSAID (*Id.*, 27). To Simmons's surprise, on March 17, 1992, Monsanto initiated termination of the COX-2 project with Simmons and BYU (1992.03.23 Needleman Letter to Simmons re annoyance with explanation letter).

IV.    The BYU/Pfizer Litigation

Between 1998 and 2006, Simmons came to realize through various domain-related conversations and presentations that the materials and knowledge he had shared with Monsanto during their collaboration were used to develop Celebrex (2006.10.18 BYU and Simmons Complaint Against BYU and Pfizer 24-29, 39-40). On October 18, 2006, over fourteen years after the BYU/Monsanto project deteriorated, BYU filed suit against Pfizer (which had acquired Monsanto's pharmaceutical arm in 2003) alleging, among other things, their illegal use of BYU's COX-2 intellectual property (*Id.*). Simmons was instrumental in informing the multi-year litigation between BYU and Pfizer (2013.06.26

Simmons First Submission to Subcommittee, 4). During the course of this litigation, Robertson was deposed and disclaimed any financial claim to the COX-2 discovery, stating, "I had no financial claim to anything there because it was Dan's discovery" (2011.01.11 Dep. of DLR, 128-29). After settling the lawsuit in April 2012, Pfizer compensated BYU $450 million (2012.06.11 Settlement Agreement (not signed not filed), 8-9). Per BYU's IP policy, 55% of the funds were allocated to BYU and 45% were set aside for the developers of the COX-2 invention (2012.06.13 Draft Dev. Distrib. Agmt. Sent to Xie, 2-3).

V.      The BYU IP Developer Committees

In June 2012, following the Pfizer settlement, BYU leadership organized a committee (Committee) to determine COX-2 developer status and outline appropriate financial distributions based on a list of individuals, created by Simmons, who were working on or around the project during the time of discovery and development (2012.06.06 Meeting Minutes from 6.6.12). The Committee decided the 2001 BYU intellectual property policy would govern all issues relating to developer status and fund distribution (2012.06.13 Draft Dev. Distrib. Agmt. Sent to Xie, 1). The 2001 Policy states, in part, that the developer or developers of intellectual property that creates a revenue stream for BYU will receive 45% of net revenues, while BYU will receive the remaining 55% (to be split equally between the developers' college and the Technology Transfer Office) (2001.00.00 2001 IP Policy, 14 (Income Distribution)). The 2001 Policy further provides that in the event of a dispute involving the developers or the University that cannot be resolved through informal discussions, the Council on Research and Creative Activities will constitute a subcommittee to investigate the dispute and make a recommendation to the Associate Academic Vice President for Research, who will make a final determination to resolve the dispute (*Id.*, 20 (Dispute Resolution)).

Of the nine BYU and two Harvard individuals reviewed by the Committee as potential developers, the Committee determined that Dr. Weilen Xie and Dr. Daniel L. Simmons were the only individuals whose performance rose to the level of an "original, creative, peer contribution" that would grant developer status (2012.06.06 Meeting Minutes from 6.6.12). The Committee also determined that Xie's "contribution as a 'developer' was modest in terms of the overall process of achieving the settlement" from Pfizer (*Id.*, 2).

On June 13, 2012, an income distribution agreement outlining proposed distributions among BYU, Simmons, and Xie was drafted (2012.06.13 Draft Dev. Distrib. Agmt. Sent to Xie, 2-3). BYU and Simmons signed the agreement, but Xie did not (*Id.*, 9). Xie was surprised by the proposal (2013.01.07 Decl. of W. Xie, 5-6); he had not been in attendance at the Committee meeting and was unaware of the details leading to the agreement (*Id.*). Between July and November 2012, distribution negotiations among Xie, Simmons, and BYU were unsuccessful, leading to the formation of a second BYU subcommittee (Subcommittee) tasked with evaluating Xie's and Simmons's respective

developer contributions (2013.06.26 Xie First Submission to Subcommittee; 2013.06.26 Simmons First Submission to Subcommittee). As part of the Subcommittee's fact-finding, Robertson was asked to contribute a declaration outlining his understanding of the relevant facts. In that declaration, Robertson stated that "Dr. Xie independently identified and sequenced the functional, full length cDNA clone that proved the existence of the COX-2 gene." (2013.07.21 Declaration of DLR to Subcommittee, 10). Robertson also explained that Xie's "creative and original hypothesis" regarding an unspliced intron in the COX-2 gene and his "innovative experimental approaches" devised to prove that hypothesis constituted the "most crucial" development in the COX-2 research program that ultimately led to BYU being the first to obtain the sequence of the COX-2 gene (*Id.*, 19).

On February 13, 2014, the Subcommittee, following extensive study, fact-finding, interviewing, and discussion, concluded that the percentage of contribution to the conception and commercialization of the technology was 97% for Simmons and 3% for Xie (2014.02.13 Subcommittee Recommendation and Report, 23-24). After review, BYU executives agreed with the Subcommittee's recommendation, and on February 24, 2014, notified Simmons and Xie of the outcome (2014.04.24 Ltr from Alan Harker to Counsel).

VI.    Robertson's Developer Claim

At some point during the Subcommittee proceedings, Robertson arrived at the view that he was also entitled to some portion of the Pfizer settlement funds in light of his involvement in the COX-2 invention. In an email to his ex-wife dated August 31, 2013, Robertson stated his intention to speak with Xie about the possibility of Xie sharing some portion of his (Xie's) ultimate compensation ("whether it be 1%, or 5%, or 10%, etc.") (2013.08.31 753 pm Email from DLR to ex-wife (ROBERTSON 001550-001553)). On October 24, 2013, Robertson wrote a letter to Dr. David Bearss, a member of the BYU Subcommittee, declaring involvement in the COX-2 invention and urging the Subcommittee to also consider his (Robertson's) contributions in its deliberations about the proper allocation of the settlement funds (2013.10.24 DLR Ltr to Bearss).

On March 4, 2014, attorney Kouretchian, representing Robertson, sent a letter to Dr. Bearss, formally asserting a claim as a co-developer of the COX-2 gene and a legal interest in a portion of the compensation awarded to BYU as part of the Pfizer settlement (2014.03.04 Kouretchian Ltr to Bearss). Unfortunately, five months later, on August 25, 2014, Robertson passed away. His successor in interest, the Donald L. Robertson Trust (Trust), was substituted as the party to his claim.

In January 2015, Simmons, Xie, and BYU agreed on and signed an income distribution and settlement agreement pursuant to the Subcommittee's conclusions (2015.01.21 Simmons and Xie Distribution Agreement). This agreement recognized that Robertson had asserted a claim to some of the settlement funds and explained that BYU's counsel had initiated an interpleader action–a common civil legal procedure that can be

1   initiated by a neutral stakeholder when two or more parties claim rights to property being
2   held by the stakeholder (*See* Fed. R. Civ. Proc. 22)–in the United States District Court for
3   the District of Utah to resolve this claim (2015.01.21 Simmons and Xie Distribution
4   Agreement, 2). The agreement specified that the sum of $1,000,000 had been set aside as
5   interpleaded funds (*Id.*, 4). It also stipulated that in the event that Roberston was
6   determined, during the course of the interpleader action, not to be a developer of the
7   COX-2 invention, the interpleaded funds would be distributed to Xie (*Id.*).
8
9   Since 2015, multiple legal disputes have arisen regarding the allocation of the
10  Pfizer settlement funds among Simmons, Xie, BYU, and Robertson. In 2019, the District
11  Court dismissed the Trust's breach of contract claims against BYU (*Beus Gilbert PLLC v.*
12  *Donald Robertson, Brigham Young University, Weilin Xie, Daniel L. Simmons*, No. 2:12-cv-
13  00970-RJS, 2019 WL 528303 (D. UT. Feb. 11, 2019)). In April 2021, on appeal, the United
14  States Court of Appeals for the Tenth Circuit partially reversed, finding plausible implied
15  contracts pursuant to BYU's 1992 IP Policy, which the court suggested should be the
16  governing policy rather than the 2001 IP Policy that BYU had used in its decision-making
17  to that point (2021.04.30 10th Circuit Opinion, 5). On remand, the Trust filed an amended
18  crossclaim; BYU responded with a crossclaim for declaratory relief to determine the
19  applicable policy. In its crossclaim, BYU asserted that the Trust's crossclaim was subject
20  to the alternative dispute resolution procedures outlined in the 2001 Policy or,
21  alternatively, the 1992 Policy (*See* 2022.08.24 Stewart Order, 5-6). In response, the District
22  Court ordered the parties to follow the procedures outlined in the 1992 Policy to allocate
23  the settlement funds (*Id.*, 11).
24
25  VII.    The Robertson/BYU Arbitration
26
27  BYU's 1992 Intellectual Property Policy dispute resolution process states:
28
29       Any dispute involving the developers, the college, or the Technology
30       Transfer Office which cannot be settled through informal
31       discussions shall be submitted for mediation to the Associate
32       Academic Vice President over Technology Transfer. If the dispute
33       remains unresolved, either party may submit it for arbitration to a
34       three-person panel to be selected from knowledgeable members of
35       the University community as follows: one person selected by the
36       developer, one person selected by the Associate Academic Vice
37       President over Technology Transfer, and one person selected by the
38       first two selectees. The arbitration process will be conducted in a fair
39       manner in consultation with the Office of General Counsel as to
40       procedure. The decision of the arbitration panel shall be in harmony
41       with University policies and be binding on all parties.
42
43  (1992.00.00 BYU IP Policy, 3-4 (Dispute Resolution)).
44

In May 2023, BYU delivered to the Trust a demand for arbitration to resolve the Trust's claims against BYU, pursuant to the 1992 IP Policy's dispute resolution procedures (2023.05.09 BYUs Notice of Arbitration).

Over the following year, in accordance with the 1992 BYU IP Policy, the Trust and BYU each identified an arbitration panel member: Stephanie Plamondon, Professor of Law at BYU Law School for the Trust, and Paul Savage, a Professor of Chemistry and Biochemistry at BYU for BYU. These two panelists, in turn, selected Bryan Howell, Professor in the Design Department at BYU, as the third panel member. The panelists also had access to a neutral and knowledgeable legal resource, Thomas Lee, Professor at BYU Law School and former Justice on the Utah Supreme Court, who provided the panelists with insight into legal terminology and procedure. All the panelists are current faculty members within the BYU community and are being compensated for their time and efforts spent on this panel.

On May 22, 2024, the first meeting took place among the Trust's Counsel, BYU's Counsel, and the newly constituted Arbitration Panel (Panel) to facilitate introductions and establish a schedule for exchanging arbitration documents. Between May and October 2024, the Panel received and reviewed the Trust's Supplemental Claim for Arbitration, BYU's Response thereto, the parties' witness lists, and counsels' reports and correspondence on discovery issues.

On October 10, 2024, all parties reconvened to establish arbitration brief deadlines and discuss expectations for the arbitration hearing dates. Due to unforeseen circumstances, on January 16, 2025, Thomas Lee stepped away as the Panel's legal resource, and James Phillips, Associate Professor and Director of the Constitutional Government Initiative at BYU's Wheatley Institute, became the Panel's new legal resource.

Over December 2024 and January 2025, opening briefs and supporting documents were produced and shared among the Trust, BYU, and the Panel. The arbitration hearing (Hearing) was held in person in a collection of conference rooms on the BYU campus on January 30-31, 2025.

The Hearing provided the Trust and BYU with five and a half hours each to present evidence, examine witnesses, and deliver opening and closing statements. Transcripts from both days' proceedings were recorded and shared with all parties. With permission from all parties, Weilin Xie, the graduate student named as a developer and one of the witnesses at the Hearing, was accompanied by his legal representative, who provided live counsel to Xie during his testimony. During February and March 2025, post-hearing briefs and clarifying documents were shared among BYU, the Trust, the Panel, and Xie's counsel.

Following the Hearing, the Panel met multiple times to discuss and assess the

Hearing presentations and documents. The panelists spent many hours, both individually and collectively, reviewing and discussing hundreds of pages of documents, asking and answering questions, and seeking clarity on the issues. They have worked diligently to critically assess the presented content and testimony. Their findings and ruling represent a consensus stemming from multiple deliberations and a joint drafting of this document.

## DISCUSSION

The Trust asserts a breach of contract claim against BYU. Specifically, the Trust argues that BYU breached the 1992 IP Policy with Robertson (2024.12.16 Arbitration Opening Brief (26513471.v4), 1). The Trust cites to Utah law for the elements of a breach of contract claim (*See id.*, 1). According to the case law the Trust quotes, to prevail on a claim of breach of contract, a claimant must prove four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." (*See America West Bank Members, L.C. v. State*, 342 P.3d 224, 230-31 (Utah 2014) (citation omitted)).

As for the first element—the existence of a valid contract—all parties agree that the relevant contract in this case is BYU's 1992 IP Policy ("Policy") and that Robertson and BYU are bound by it (2022.05.31 BYU Motion to Stay Proceedings and for Partial Summary Judgment on Policy Procedures, ii). The Policy outlines the respective duties of academic developers and BYU when a developer creates an invention or other work in the course of their employment at BYU that gives rise to a revenue stream (1992.00.00 BYU IP Policy). The Policy requires that "[p]rior to public disclosure or submission for publication, developers of intellectual property … shall disclose to their Chair, Dean, and to the Technology Transfer Office any such property … upon realization that it has commercial potential suitable for development." (*Id.*, 2 (Administrative Processes)). In addition, developers are required to disclose relevant relationships, obtain signed confidentiality and non-disclosure agreements from involved individuals, and sign an "Assignment and Royalty Agreement" (*Id.*). Further, the Policy requires that "[d]evelopers, together with the Department Chair … will devise an appropriate net income sharing plan" (*Id.*, 3 (Income Distribution Among Developers)).

As for the remaining elements of the Trust's claim, the Trust asserts, first, that Robertson performed under the contract by contributing to the development of the COX-2 invention and timely disclosing his developer status to the relevant parties (2024.12.16 Arbitration Opening Brief (26513471.v4), 2-13; 2025.01.24 Robertson Trust Arbitration Reply Brief, 11); next, that BYU breached the contract by failing to include Robertson in discussions about the Pfizer settlement funds, by failing to identify Robertson as a developer, by applying the wrong IP policy, and by initiating an interpleader action against Robertson (2024.12.16 Arbitration Opening Brief (26513471.v4), 15-29); and finally, that Robertson was harmed by BYU's alleged breach and is entitled to damages under various damages theories (*Id.*, 30-33).

The Panel concludes that the Trust has not succeeded in making out a claim under the legal framework it has advanced. Specifically, the Panel finds that the Trust has not succeeded in showing that Robertson performed under the Policy or that BYU breached the Policy. Accordingly, the Panel does not reach the issue of damages.

I.    The Trust has Not Established that Robertson Performed Under the Policy by Contributing to the COX-2 Invention

The Trust argues that Robertson performed under the Policy by contributing to the COX-2 invention in various ways. In making these arguments, the Trust asserts that Robertson's contributions should be evaluated with reference to federal patent law's definition of "joint inventor" (2023.01.31 Robertson Mediation Statement, 2).[2] According to the case law the Trust relied on in its briefing, this federal patent law identifies developers of an invention as those who "contribute in some significant manner to the conception or reduction to practice of an invention." (*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1371 (Fed. Cir. 2020) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998))). "Conception" is further defined as developing an idea of the invention that is "definite and permanent enough that one of skill in the art could understand [it]," while "reduction to practice" requires "verification that [the] invention actually works" (*Id.*, 1372*)*. Adopting the Trust's definition, the Panel concludes that the Trust has not succeeded in showing that Robertson was a developer of any aspect of the COX-2 invention.

A.  Robertson's alleged contributions to the sequencing of the COX-2 gene

One undisputed component of the COX-2 invention that gave rise to the eventual settlement between Pfizer and BYU is the initial COX-2 sequence that enabled Monsanto (later Pfizer) to develop a selective COX-2 inhibitor (*See* 2023.01.31 Robertson Mediation Statement, 2). The Trust makes two arguments that Robertson was a developer of the COX-2 gene sequence. First, that Robertson was involved in conducting a 5′ race procedure to sequence the gene, and second, that Robertson contributed to the unspliced intron hypothesis that enabled the gene to be sequenced (*Id.*, 2-3). The Panel evaluates each of these in turn.

i.    Roberston's alleged contribution of a 5′ race procedure

First, the Trust argued in its written submissions and at the Hearing that 5′ race experiments conducted by Robertson contributed to the sequencing of the gene for COX-2 (*Id.*; 2025.01.30 Arbitration Transcript, 17). The Trust asserted that Robertson and Xie together conceived of a method for obtaining the COX-2 sequence through the 5′ race procedure and reduced the sequence to practice by conducting this procedure (2025.01.30 Arbitration Transcript, 17). BYU, for its part, pointed out that no 5′ race experiments were

---

[2] The Trust used the terms "joint inventor" and "developer" interchangeably.

1   described in the PNAS paper describing the gene sequence (*Id.*, 28-29). Simmons and Xie
2   each testified at the Hearing that 5′ race experiments were not required to obtain the
3   COX-2 sequence and that Robertson was not involved in the sequencing process
4   (2025.01.31 Arbitration Transcript, 54, 97).
5
6       The Trust presented as evidence at the Hearing lab notebook pages from both
7   Robertson and Xie showing documentation of similar procedures (2025.01.30 Arbitration
8   Transcript, 121-22); the Trust argued that this demonstrated that Xie, in collaboration
9   with Robertson, used 5′ race procedures in sequencing the COX-2 gene (*Id.*). The Trust
10  presented no other evidence to demonstrate that Robertson and Xie collaborated in
11  conceiving of or using a 5′ race procedure to obtain the COX-2 gene sequence. Xie, for his
12  part, testified that he did not use 5′ race experiments in the sequencing and that he
13  conducted the sequencing independently without Robertson's help (2025.01.31
14  Arbitration Transcript, 97).
15
16      With respect to the Trust's 5′ race argument, the Panel finds that the Trust has not
17  established that 5′ race experiments were used to obtain the COX-2 gene sequence or that
18  Robertson was a developer by virtue of contributing 5′ race experiments to the
19  sequencing process. The Panel finds persuasive Xie's and Simmons's testimony that a 5′
20  race experiment was not used to obtain the COX-2 gene sequence. This testimony is
21  supported by the PNAS paper describing the COX-2 gene sequence, which does not
22  mention any 5′ race procedure (1991.04.00 PNAS Article). In light of this evidence, the
23  Panel finds that the Trust has not established that Robertson contributed to the COX-2
24  sequencing by conducting 5′ race experiments.
25
26          ii.    Roberston's alleged contribution to the unspliced intron
27                 hypothesis
28
29      The Trust also asserts that Robertson was a co-developer of the COX-2 gene
30  sequence by virtue of his contributions to the "unspliced intron hypothesis," which all
31  parties agree was a necessary component of the sequencing process (2025.01.30
32  Arbitration Transcript, 17, 28, 35, 195) The Trust argues that Robertson was a developer
33  of the COX-2 gene sequence because he either conceived or co-conceived (with Xie) the
34  unspliced intron hypothesis and contributed to the identification of that intron and the
35  eventual full gene sequence of COX-2 (*Id.*, 17). The Trust presented as evidence of this
36  argument a page from Robertson's lab notebook containing the word "intron" written in
37  pen or pencil (2025.01.31 Arbitration Transcript, 155). Xie, for his part, testified that the
38  word "intron" was written long after the dated experiments were performed (Dr. Weilin
39  Xie's Post-Arbitration Declaration, 3). Xie and Simmons each also testified that the
40  unspliced intron hypothesis and the identification of that intron were Xie's work alone
41  (*Id.*, 63, 107).
42
43      The Panel finds that the Trust has not established that Roberston was a developer
44  by virtue of any contribution to the unspliced intron hypothesis. Evidence for Robertson's

involvement in the discovery of the unspliced intron is weak and relies on a single word written on a notebook page containing writing that appears to come from multiple different handwriting sources (1990.00.00 WX notes to DR re finding oligos (004158)). The page of the lab notebook in question features several styles of writing, and it is not clear when the word intron was written or who wrote on the page (2025.01.31 Arbitration Transcript, 155; Dr. Weilin Xie's Post-Arbitration Declaration, 3). Additionally, Robertson himself stated that Xie was the initiator of the unspliced intron hypothesis and that no one assisted Xie in sequencing the gene (2013.07.21 Declaration of DLR to Subcommittee, 19; 2013.10.21 2nd Declaration of DLR to SubCommittee, 9). The Panel finds persuasive Xie's testimony that he alone was the source of the unspliced intron hypothesis, and statements from Robertson and Simmons are consistent with this conclusion (2013.07.21 Declaration of DLR to Subcommittee, 19; 2025.01.31 Arbitration Transcript, 63). Specifically, Robertson stated "I know that Dr. Xie originated the unspliced intron hypothesis[.]" (2013.10.21 2nd Declaration of DLR to SubCommittee, 9).

In conclusion, the Panel finds that the Trust has not established that Robertson was a co-developer of the COX-2 invention by virtue of contributing to the COX-2 gene sequencing—either by conceiving of or conducting 5' race experiments relevant to the invention or by contributing to the unspliced intron hypothesis and subsequent experiments. The evidence shows at most that Robertson contributed to the development of the COX-2 sequence by providing materials and lab space to Xie (2025.01.30 Arbitration Transcript, 120; 2013.10.21 2nd Declaration of DLR to SubCommittee, 2), contributions that do not elevate Robertson to developer status. Robertson and Xie both stated that Xie worked independently in developing the COX-2 gene sequence (2013.07.21 Declaration of DLR to Subcommittee, 10-12; 2013.06.26 Xie First Submission to Subcommittee, 3), and the Panel finds these statements credible.

B. Robertson's alleged contribution to a COX Testing System

The Trust next asserts that Robertson was a co-developer of the invention that generated revenue for BYU under the Pfizer settlement because he contributed to a "testing system" to screen for COX inhibitors (2025.01.30 Arbitration Transcript, 9-10). The Trust at various times argued that Robertson contributed to a testing system because he 1) contributed 3T3 cells whose COX-1 selectivity was communicated by Simmons to Monsanto (*Id.*, 11); and 2) contributed RS-2 cells whose COX-2 selectivity was discovered by Robertson and communicated by Simmons to Monsanto (*Id.*; 2025.01.31 Arbitration Transcript, 53-58). The Panel will address each argument in turn.

i. Roberston's alleged contribution to the COX-1 selective 3T3 cells

The Trust argued in its written submissions and at the Hearing that Robertson contributed to a testing system to screen for COX inhibitors by virtue of his contribution of 3T3 cells that were found to be COX-1 selective—a result that was communicated by

Simmons to Monsanto (1992.03.20 Simmons letter to Needleman, 2; 2025.01.31 Arbitration Transcript, 35). The Trust argued that Robertson conceived of the idea of testing 3T3 cells for COX selectivity, obtained the cells, performed the testing himself, and discovered that the 3T3 cells were, in fact, COX-1 selective (2025.01.30 Arbitration Transcript, 11, 15).

There was a dispute in the briefing and at the Hearing, however, about the precise line of 3T3 cells that BYU researchers used to test for COX selectivity (*Id.*, 29). While Roberston obtained cells from Smith at the NIH (Smith 3T3 cells), both Xie and Simmons testified that the 3T3 cells used to test for COX selectivity were obtained by Simmons from Bassin at the NIH (Bassin 3T3 cells) (2025.01.31 Arbitration Transcript, 34-35, 109). Simmons testified that these Bassin 3T3 cells were shown to be COX-1 selective, could be induced to produce COX-2, and were also used as a source of COX-2 (*Id.*, 34-49); he also stated that this work was done by Xie (*Id.*, 47). In his report in the Pfizer case, Simmons testified that Monsanto was able to get the "Simmons effect" (differential expression of COX-1 and COX-2) from the Bassin 3T3 cell line (2011.02.18 Prescott Report, 151; 2025.01.31 Arbitration Transcript, 43). Additionally, Robertson did not obtain his separate line of Smith 3T3 cells until nine days after Simmons and Xie made their discovery on the Bassin 3T3 cells. (2025.01.31 Arbitration Hearing Transcript, 34-35; 1991.02.19 Mark Smith letter to DLR (Trust Claim Exh 8)).

The Panel finds that the Trust has not established that Robertson contributed as a developer to a testing system for COX selectivity by obtaining or performing experiments on 3T3 cells. Simmons and Xie each testified that the 3T3 cells used to develop the testing system were not the Smith 3T3 cells obtained by Robertson, but instead the Bassin 3T3 cells obtained by Simmons (2025.01.31 Arbitration Transcript, 43, 109), and the Panel finds this testimony credible. The Trust presented no evidence that Robertson initiated the idea that 3T3 cells could be used to develop a testing system for COX, conducted experiments using Bassin 3T3 cells, or that he communicated any results of these experiments to Simmons, Xie, or Monsanto. In its closing arguments, the Trust itself conceded that the 3T3 cells that constituted part of the COX testing system were, in fact, Bassin 3T3 cells and disclaimed any contribution by Robertson to this aspect of the testing system (*Id.*, 163-64). The Panel thus concludes that the Trust has not established that Robertson was a developer by virtue of any contribution to the 3T3 portion of the COX testing system.

        ii.    Roberston's alleged contribution to the COX-2 selective RS-2 cells

The Trust also argued in its briefing and at the Hearing that Robertson co-developed a testing system to screen for COX inhibitors by contributing the RS-2 cell line that was found to be COX-2 selective (2024.12.16 Arbitration Opening Brief (26513471.v4), 12-13; 2025.01.30 Arbitration Transcript, 14-15). The Trust argues that Robertson conceived of the idea of testing RS-2 cells for COX selectivity, obtained the cells,

performed the testing himself, and discovered that the RS-2 cells were in fact COX-2 selective (2025.01.30 Arbitration Transcript, 14-15, 29). Despite the fact that RS-2's COX-2 selectivity was not communicated to Monsanto until after Monsanto had initiated termination of the Simmons/Monsanto collaboration, the Trust argues that the RS-2 discovery contributed to the eventual monetary recovery of BYU in the Pfizer litigation and should therefore be considered part of the COX-2 "invention" for purposes of ascertaining developer status (2025.02.14 Arbitration Post Hearing Brief, 1-9).

It is undisputed that Robertson received the RS-2 cell line from Smith at the NIH in 1991; Xie and Simmons each testified to this effect (2024.12.16 Arbitration Opening Brief (26513471.v4), 9; 2025.01.31 Arbitration Transcript, 57-58, 110-11). It also appears that Robertson wanted to characterize COX production in the RS-2 cell line: Simmons testified that Robertson asked him for materials to conduct this characterization (2025.01.31 Arbitration Transcript, 64-65). Simmons testified that he refused Robertson's request and required that any characterization of the RS-2 cell line for COX production be performed by Xie using Simmons's materials or clones (*Id.*). As for Robertson's motivation for obtaining the RS-2 cell line, Xie testified that Roberston obtained the cell line at Xie's request, after Xie conceived of the hypothesis that cell lines expressing the oncogene *fos* would show elevated expression of COX-2 (*Id.*, 110-12). Xie also testified that he (Xie) performed the RS-2 characterization experiments himself using Simmons's COX-1 and COX-2 clones (*Id.*, 112-13).

Robertson himself made conflicting statements about his level of involvement in the characterization of the RS-2 cell line. At one point, Robertson claimed that he alone was responsible for generating the RS-2 data included in Xie's dissertation: "All of the data included in Weilin Xie's dissertation using the different viral oncogene transformed cells were generated by me and included in Weilin Xie's dissertation." (2014.00.00 DLR notes re his cell line contributions, 1). He also stated that his (Robertson's) "research was the first to demonstrate that the COX-2 gene was elevated in many oncogene transformed cells," presumably with reference to the RS-2 cell line (*Id.*) However, on at least one occasion, Robertson indicated that Xie's dissertation was Xie's work alone, contradicting his statement that he (Robertson) was the person responsible for generating the RS-2 data (2013.07.21 Declaration of DLR to Subcommittee, 7, 19-20).

The Panel finds that the Trust has not established that Robertson's potential contributions with respect to the RS-2 cell line are sufficient to grant him developer status. Although Robertson did obtain the RS-2 cell line (perhaps at Xie's request) and was possibly involved in its characterization, the Panel finds these facts insufficient to demonstrate that Robertson was a developer of a COX testing system or the COX-2 invention more generally by conceiving of the invention or reducing it to practice.

As for conception (developing a definite idea of the invention), the Panel finds that the key conceptual discovery in the COX-2 invention was the realization of the potential value of COX-2 selective inhibitors and the need for a COX-1/COX-2 screening system

to identify selective inhibitors. While Simmons stated that he immediately understood the implications of discovery of a second COX enzyme, there is no evidence that Robertson appreciated the significance of the sequencing of the COX-2 gene until much later (1989.10.19 DLS Disclosure Letter to EW (ROBERTSON 004164-004169); 2024.12.16 Arbitration Opening Brief (26513471.v4), 13). In his proposal to Monsanto, Simmons laid out the importance of the COX-2 discovery, but Robertson was not part of the proposal (1991.04.05 Simmons Research Proposal to Monsanto). Further, although the evidence tends to show that Robertson obtained the RS-2 cells and asked Simmons for the materials to characterize their COX-2 production, the Trust presented no evidence of his motivation for doing so—specifically, whether these actions were in the service of developing a COX screening system. In contrast, Xie testified that Robertson obtained these cells at his (Xie's) request after Xie conceived of the hypothesis that cell lines expressing *fos* would show elevated levels of COX-2 (2025.01.30 Arbitration Transcript, 110-12). The Panel finds Xie's testimony credible.

As for reduction to practice (verification that an invention works for its intended purpose), conflicting statements by Xie, Simmons, and Robertson himself make it difficult for the Panel to discern to what extent Robertson was involved in the characterization of the RS-2 cell line (2025.01.31 Arbitration Transcript, 64-65, 112-13; 2025.01.30 Arbitration Transcript, 81); but the Panel finds that the Trust has not established that Robertson was a developer by virtue of reducing the RS-2 invention to practice.

Finally, the Parties agree that the RS-2 cell line was not provided to Monsanto nor used by it to screen compounds for COX-1/COX-2 selectivity (2025.02.14 Arbitration Post Hearing Brief, 1; 2025.01.31 Arbitration Transcript, 178). The testing system used by Monsanto was of its own design and required the COX-2 clone and likely the polyclonal antibodies to COX-1 and COX-2 provided by Simmons (2025.01.31 Arbitration Transcript, 39-40). BYU did make reference to the RS-2 cell line in its arguments in the Pfizer litigation; the district court in that litigation denied a motion for summary judgment in part because further fact finding was required on the question of BYU's "compilation trade secret" claims that included the RS-2 cell lines (2012.03.20 J. Stewart decision re Pfizer MSJ No 6, 12-13). However, the Trust has not established that the ensuing settlement was related in whole or in part to BYU's claims about the RS-2 cell line.

For the above reasons, the Panel finds that the Trust has not established that Robertson's involvement in the RS-2 cell line work was sufficient to grant him developer status with respect to a COX-2 testing system that led to a revenue stream for BYU.

II.     The Trust has Not Established that Robertson Performed Under the Policy
        by Timely Disclosing his Alleged Contributions to the COX-2 Invention to
        the Relevant Parties

        The Trust argued in its briefs and at the Hearing that Robertson performed under
the Policy because he reached out to BYU through his attorney in March 2014 to inform
BYU that he considered himself a developer of the COX-2 invention (2014.03.04
Kouretchian Ltr to Bearss). Under the Policy, academic developers are required to
disclose to "their Chair, Dean, and to the Technology Transfer Office" any intellectual
property or creative work they anticipate will generate revenue (1992.00.00 BYU IP
Policy, 1 (Administrative Processes)). They are to do this "upon realization that [their
work] has commercial potential suitable for development" and before they publicly
disclose or submit the work for publication (*Id.*).

        The Trust argued that the disclosure of Robertson's attorney to BYU in 2014 was
timely under the Policy's timing requirement because Roberston did not previously
realize that the work had "commercial potential suitable for development." (1992.00.00
BYU IP Policy, 1 (Administrative Processes; *see also* 2025.01.30 Arbitration Transcript, 25-
26). In support of this claim, the Trust offers as evidence a letter from Simmons to his
Dean and Department Chair in May 2012 (following the Pfizer settlement) (2012.05.30
Letter from DLS re 6-6-12 Meeting). In the letter, Simmons states that he "was not in any
position to know that a revenue stream had been developed, except through the nearly
14-year process" of the Pfizer litigation (*Id.*, 1). Simmons also states in this letter that "it
was impossible to address the question of whether multiple individuals could be
considered to be responsible for the revenue stream until now." (*Id.*).

        For its part, BYU argues that Robertson should have realized much earlier than
March 2014 that the COX-2 invention had "commercial potential." (2025.01.31 Arbitration
Transcript, 171-72). BYU pointed out that Robertson was aware of the
Simmons/Monsanto collaboration (2025.01.30 Arbitration Transcript, 30), knew of the
Pfizer litigation (because he testified in that case) (*Id.* , 173), and knew of the developer
funds distribution dispute between Simmons and Xie (because he wrote to the
Subcommittee on Xie's behalf in that dispute) (2014.2.14 DLR Letter Re Subcommittee
Proceedings); and that it was not until after these events had taken place that Robertson
informed BYU that he considered himself a developer (2025.01.30 Arbitration Transcript,
36). BYU noted that Simmons reached out to BYU, disclosing the COX-2 invention and
its commercial potential and identifying himself and Xie as developers in October 1989
(2025.01.31 Arbitration Transcript, 176-77), while Robertson never made a similar
disclosure and was not included as a developer on Simmons's disclosure (1989.10.19 -
DLS Disclosure Letter to EW (ROBERTSON 004164-004169)). BYU also argued that
Robertson was aware of the disclosure process under the Policy because he made
disclosures related to a separate invention in 1993-1995 (1993.00.00 Stratagene File (from
Astle Declaration)).

The Panel finds that the Trust has not established that Robertson performed under the Policy by disclosing his alleged developer status in 2014. Although Robertson did eventually disclose to BYU that he considered himself a developer of the COX-2 invention, this was more than twenty-four years after Simmons made his disclosure to BYU and almost two years after the Pfizer settlement. His disclosure was thus not timely under the Policy. The Policy does not contemplate that a developer will wait until a revenue stream has been definitively established before disclosure; instead, it requires developers to disclose immediately upon realization of "commercial potential" and prior to publication (1992.00.00 BYU IP Policy). The PNAS paper describing the COX-2 gene sequence (on which Robertson was listed as an author) was published in 1991, over twenty years prior to Robertson's disclosure (1991.04.00 PNAS Article). Moreover, when Robertson communicated to BYU that he considered himself a developer of the COX-2 invention, he did so by having his attorney contact Dr. Bearss, who was heading the Subcommittee mediating the dispute between Simmons and Xie, rather than following the process contemplated by the Policy of disclosing to the "Chair, Dean, and to the Technology Transfer Office." (1992.00.00 BYU IP Policy, 1 (Administrative Processes); 2014.03.04 Kouretchian Ltr to Bearss). Robertson was aware of this process, as evidenced by his compliance with it in 1993-1995 when he disclosed a separate invention (1993.00.00 Stratagene File (from Astle Declaration)). Thus, the Trust has not established that Robertson met his obligations under the Policy.

### III.    The Trust has Not Established that BYU Breached the Policy

The Trust next argues that BYU breached its duty under the Policy (1992.00.00 BYU IP Policy). The Trust asserts that BYU breached its duty to Robertson under the Policy in various ways, including by "letting the fox guard the henhouse" in looking to Simmons alone to determine who was a developer of the COX-2 invention, and by distributing funds to Simmons and Xie pursuant to the Pfizer settlement without consulting Robertson (2024.07.05 Robertson Arbitration Claim, 23-24). The Trust also asserts that BYU wrongly gave undue credit to Simmons and insufficient credit to Robertson by applying the incorrect version of the IP Policy (*Id.*, 29-30). The Trust further argues that BYU breached its duty to Robertson by initiating an interpleader action in federal court after Robertson's attorney reached out to BYU (2014.03.20 Complaint in Interpleader; 2025.01.30 Arbitration Transcript, 149, 153). Finally, the Trust argues that BYU breached its duty to Xie under the 2001 IP Policy and that this breach is relevant to BYU's conduct with respect to Robertson (2025.01.30 Arbitration Transcript, 20-22). The Panel finds that the Trust has not established that BYU breached its duty to Robertson under any of these theories.

### A.  BYU's investigation of COX-2 developers and its distribution of funds to Simmons and Xie

The Trust argues that BYU breached its duty to Robertson by allowing the meeting to determine developer status following the Pfizer settlement to be conducted by

Simmons (2024.07.05 Robertson Arbitration Claim, 23-24). In the Trust's view, this was tantamount to "letting the fox guard the henhouse," since Simmons had such a large financial interest in the outcome of that meeting (*Id.*, 23-24). Additionally, the Trust argues that BYU should not have distributed Pfizer settlement funds to Simmons and Xie without first consulting Robertson (*Id.*, 2, 23). BYU contends that it was reasonable for BYU to allow Simmons to conduct the meeting and to trust Simmons's statement in that meeting that Robertson was not a developer, especially given that Robertson himself had disclaimed financial interests (2011.01.11 Dep. of DLR, 128-29) and indicated that the COX-2 project was Simmons's (*Id.*, 68, 72).

The Panel finds that the Trust has not established that BYU breached its duty to Robertson under the Policy in these ways. Although it may have been imprudent of BYU to allow Simmons alone to lead the meeting to determine developer status, the Panel finds that this action in no way rises to the level of a breach with respect to Robertson. BYU had no legal duty under the Policy to include Robertson in this or other meetings related to the Pfizer settlement or to consult with Robertson before disbursing funds; on the contrary, it was Robertson's duty under the Policy to inform BYU that he considered himself a developer—a duty that he was aware of and knew how to perform, but did not. Additionally, it was reasonable for BYU to rely on Robertson's own statements that he was not a developer of the COX-2 invention. Throughout the Pfizer litigation, Robertson made sworn statements indicating that he was not a developer of the COX-2 technology, including the statement that he had no financial interest in a potential settlement (*Id.*, 128-29). Outside of the litigation, Robertson also made statements to this effect (2013.07.21 Declaration of DLR to Subcommittee, 13-14). Not until 2014, after the settlement funds were disbursed to Xie and Simmons, did Robertson officially inform BYU that he considered himself to be a developer (2014.03.04 Kouretchian Ltr to Bearss). The Trust has therefore not established that BYU breached a duty to Robertson by failing to include Robertson in discussions prior to this date.

### B.  BYU's reliance on the 2001 IP Policy

The Trust also argued at the Hearing and in its briefs that BYU breached its duty to Robertson because until 2022 it had been incorrectly relying on the 2001 IP Policy to determine its obligations toward Robertson (2025.01.30 Arbitration Transcript, 12-13; 2024.07.05 Robertson Arbitration Claim, 29-30). In 2022, the Utah District Court ruled that the 1992 IP Policy, rather than the 2001 IP Policy, is the governing contract in this dispute (2022.08.24 Stewart Order, 5-10). The Trust argues that BYU's previous reliance on the 2001 IP Policy led it to inappropriately discount Robertson's contributions to the COX-2 invention in several ways that amounted to a breach of contract.

First, the Trust points out that while the 1992 IP Policy uses the word "invention," the 2001 IP Policy does not (2025.01.30 Arbitration Transcript, 12-13). Further, the Trust notes that the 2001 IP Policy explicitly refers to a developer as one who contributes to the "conception and/or commercialization" of an invention (2001.00.00 2001 IP Policy, 13),

while the 1992 IP Policy makes no mention of commercialization (2025.01.30 Arbitration Transcript, 12-13). The implication of these differences, according to the Trust, is that developer status under the 1992 Policy should be made with reference to the federal patent law concept of invention—comprising conception and reduction to practice—with no consideration of commercialization (*Id.*, 8-11). The Trust contends that BYU, by following the 2001 IP Policy, inappropriately gave undue credit to Simmons for his efforts in generating the COX-2 revenue stream (commercialization) while simultaneously undervaluing Robertson's contributions to the conception and reduction to practice—especially reduction to practice—of the COX-2 invention. BYU, for its part, argues that there are no material differences between the 1992 and 2001 IP Policies and that there was nothing inappropriate in its determination of developer status under either policy (BYU Response to Trust Arbitration Brief, 37-41).

The Panel finds there is nothing related to any differences between the 2001 and 1992 IP Policies that changes its analysis regarding BYU's fulfillment of its duties to Robertson. As explained above, the Trust has not established under the legal framework it has laid out for determining developer status that Robertson was a developer of the COX-2 invention. Therefore, it has not established that BYU breached any duty to Robertson by failing to apply this framework.

## C.  BYU's initiation of an interpleader action in federal court

After Robertson informed BYU via his attorney that he considered himself a developer of the COX-2 invention, BYU initiated an interpleader action in Utah federal district court (2014.03.20 Complaint in Interpleader). The Trust argues that this action amounted to BYU "suing" Robertson and constituted a breach of duty on BYU's part (2025.01.30 Arbitration Transcript, 149, 153). BYU notes for its part that an interpleader action is distinct from a lawsuit and that initiating this action was a reasonable response to Robertson's letter (*Id.*, 33-34).

The Panel finds that the Trust has not established that BYU breached its duty to Robertson by initiating an interpleader action in federal court. As BYU pointed out, an interpleader action is not a conventional lawsuit; instead, it is simply a mechanism by which a neutral entity holding disputed funds may request a court's help in resolving the dispute (2014.03.20 Complaint in Interpleader). Since Robertson did not follow the process laid out in the Policy for determining developer status and showed no indication that he was going to do so, BYU was subject to no obligation under the Policy, and its decision to initiate an interpleader action was reasonable under the circumstances (1992.00.00 BYU IP Policy).

## D.  BYU's conduct as to Xie

The Trust spent time in the Hearing and in its briefing outlining BYU's alleged breaches of contract under the 2001 IP Policy with respect to Xie (2025.01.30 Arbitration

Transcript, 20-22). The Trust's implication seems to be that these alleged breaches provide evidence of a breach under the Policy with respect to Robertson.

The Panel cannot say how it would decide a breach of contract dispute between Xie and BYU: the question is not before us and is not in our power to decide. The Panel, therefore, declines to consider any potential breach of contract by BYU with respect to Xie in regard to an alleged breach by BYU as to Robertson.

IV.    Damages

The Trust presented multiple theories of damages to guide the Panel in allocating the settlement funds among Robertson, Simmons, and Xie in the event the Trust was able to raise a successful breach of contract claim against BYU (*Id.*, 206-11). Since the Trust was not able to establish that Robertson performed under the contract or that BYU breached its duty, the Panel will not consider these damages theories.

**CONCLUSION**

The Panel finds that the Trust cannot succeed in its breach of contract claim against BYU. In reaching this conclusion, the Panel does not wish in any way to cast aspersions on Dr. Robertson. In the Panel's view, the evidence demonstrated that Robertson was an excellent mentor and talented scientist who contributed much to BYU during his time at the institution and enjoyed a warm relationship with Dr. Xie (who, the evidence demonstrated, was an outstanding graduate student and scientist in his own right during his time at BYU). As much as the Panel respects the late Dr. Robertson, however, it finds that the evidence presented by the Trust is insufficient to establish (1) that he performed under the 1992 IP Policy by contributing to the COX-2 invention in ways that elevated him to developer status, (2) that he timely disclosed his contributions to BYU, or (3) that BYU breached any duty to him under the Policy. For all the reasons outlined above, therefore, we resolve this dispute in favor of BYU.

21