IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BEUS GILBERT PLLC,<br><br>Plaintiff,<br>v.<br><br>BRIGHAM YOUNG UNIVERSITY, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING BRIGHAM YOUNG UNIVERSITY'S MOTION TO CONFIRM ARBITRATION<br><br>Case No. 2:12-cv-00970-TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Cross-defendant Brigham Young University's ("BYU") Motion to Confirm Arbitration and Motion for Judgment on the Pleadings for Entry of Judgment,[1] and Cross-claimant Robertson Trust's Motion to Vacate.[2] For the reasons discussed herein, the Court will grant BYU's Motion and deny the Robertson Trust's Motion.

## I. BACKGROUND

In 1992, BYU biochemists discovered the COX-2 enzyme. After BYU communicated its discovery to Pfizer, Pfizer developed Celebrex, a nonsteroidal anti-inflammatory drug. In 2006, BYU sued Pfizer for misappropriation of trade secrets, and the parties settled in 2012.[3] BYU's counsel, Beus Gilbert PLLC, received $450 million from Pfizer as part of the settlement (the "Settlement Funds"). Of the $450 million, Beus Gilbert allocated 55% of the funds to BYU and 45% to be distributed to the biochemists responsible for the discovery.

---

[1] Docket No. 369.

[2] Docket No. 372.

[3] *See Brigham Young Univ. v. Pfizer*, No. 2:06-cv-00890-TS.

Initially, a dispute arose between Dr. Daniel Simmons and Dr. Weilin Xie regarding the appropriate attribution of developer credit and distribution of the Settlement Funds. To facilitate resolution, Beus Gilbert interpleaded $1 million of the Settlement Funds (Interpleader I). BYU, Dr. Simmons, and Dr. Xie then entered into a three-way settlement, intending to resolve the Interpleader. Before a settlement was reached, however, Dr. Donald Robertson claimed he was also entitled to a portion of the Settlement Funds. Beus Gilbert then filed a second interpleader, adding Dr. Robertson as an additional claimant (Interpleader II), and asked the Court to join Interpleader I and II, which the Court did on May 16, 2014. Shortly thereafter, Dr. Robertson passed away and was substituted in this litigation by the Robertson Trust (the “Trust”).

After various motions and appeals, the Trust filed an amended crossclaim against BYU alleging breach of contract. BYU filed a crossclaim for declaratory judgment regarding which BYU Policy applied to the Trust’s claim, among other things. This Court ruled that the 1992 IP Policy applies (the “Policy”), ordered the parties to follow the procedures set forth in the Policy’s dispute resolution clause (the “Dispute Resolution Clause”), and granted BYU’s motion to stay while the parties pursued resolution.[4] The Trust filed a Motion to Reopen the Case and Motion to Bar Enforcement of the Dispute Resolution Clause as Unconscionable,[5] which the Court denied.[6]

In May 2024, a three-person arbitration panel was convened (the “Panel”). Consistent with the procedures set forth in the Policy, the Trust selected Professor Stephanie Plamondon of the BYU Law School; BYU selected Professor Paul B. Savage of the Department of Chemistry and Biochemistry; and the two arbitrators jointly selected Professor Bryan Howell of the BYU

[4] Docket No. 356.

[5] Docket No. 362.

[6] Docket No. 368.

Design Department. After providing the parties opportunity to present evidence and argue their positions, the Panel concluded that "the Trust cannot succeed in its breach of contract claim against BYU," and resolved the dispute in favor of BYU (the "Arbitration Decision").[7] Subsequently, BYU and the Trust filed the Motions now before the Court.

## II. LEGAL STANDARD

"[W]hen a court with subject-matter jurisdiction orders arbitration and then stays the suit pending resolution of the arbitral proceedings, that court retains jurisdiction to confirm or set aside the arbitral award."[8] 9 U.S.C. § 10(a)(2) provides that a federal district court "in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration . . . where there was evident partiality . . . in the arbitrators."[9]

"The Federal Arbitration Act ["FAA"]. . . evinces a strong federal policy in favor of arbitration."[10] Accordingly, courts "must give extreme deference to the determination of the arbitrator for the standard of review of arbitral awards is among the narrowest known to law."[11] "Only . . . extraordinary circumstances warrant vacatur of an arbitral award."[12] "Once an

---

[7] Docket No. 369-1, at 21 (December 12, 2025, *Arbitration Decision in the Matter of Donald L. Robertson Trust v. Brigham Young University*).

[8] *Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*, 12 F.4th 1212, 1227 (10th Cir. 2021); *see also* 9 U.S.C. §§ 9, 13. Utah law similarly provides that "[i]f the notice of an award is in a matter pending before the court, the party may file a motion for an order confirming the award. The court shall issue a confirmed order unless the award is . . . vacated pursuant to Section 78B-11-124." Utah Code Ann. § 78B-11-123.

[9] Utah law similarly provides that a court may vacate an award if there was "evident partiality by an arbitrator appointed as a neutral arbitrator." Utah Code Ann. § 78B-11-124(1)(b)(i).

[10] *ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (citing *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

[11] *THI of N.M. at Vida Encantada, LLC v. Lovato*, 864 F.3d 1080, 1083 (10th Cir. 2017) (emphasis omitted) (quoting *ARW Expl. Corp.*, 45 F.3d at 1462).

[12] *Id*. (internal quotation marks and citation omitted).

arbitration award is entered, the finality that courts should afford the arbitration process weighs heavily in favor of the award, and courts must exercise great caution when asked to set aside an award."[13]

## III. DISCUSSION

In its Motion, BYU asks the Court to confirm the Arbitration Decision, enter judgment in favor of BYU and against the Trust, and authorize any Settlement Funds to be disbursed consistent with the Panel's decision and prior agreements to which BYU is a party. The Trust asks the Court to vacate the Arbitration Decision on the grounds that the arbitrators were evidently partial to BYU. Additionally, in its Response to BYU's Motions, the Trust requests that the Court sever and strike the arbitrator panel selection method from the Dispute Resolution Clause, identify a pool of arbitrators from which the parties may select an impartial three-person panel, and order the parties to engage in a second arbitration.

Here, the Dispute Resolution Clause of the Policy provides that:

> Any dispute involving the developers, the college, or the Technology Transfer Office which cannot be settled through informal discussions shall be submitted for mediation to the Associate Academic Vice President over Technology Transfer. If the dispute remains unresolved, either party may submit it for arbitration to a three-person panel to be selected from knowledgeable members of the University community as follows: one person selected by the developer, one person selected by the Associate Academic Vice President over Technology Transfer, and one person selected by the first two selectees. The arbitration process will be conducted in a fair manner in consultation with the Office of General Counsel as to procedure. The decision of the arbitration panel shall be in harmony with University policies and be binding on all parties.[14]

The Trust argues that "[t]he arbitrators are evidently partial to BYU because they are current BYU employees," who receive their pay, benefits, and retirement directly from BYU,

---

[13] *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986).

[14] Docket No. 369-1, at 8.

and thus cannot be impartial.[15] Additionally, during the selection process, the Trust specifically objected to BYU's selection of Professor Savage on the grounds that his personal and pecuniary interest in the arbitrary proceedings was significant, and does so now again. The Trust contends that Professor Savage would have been fully aware that Pfizer paid $450 million to settle with BYU, with roughly $80 million of the Settlement Funds going to the department he works in—the Department of Chemistry and Biochemistry. Professor Savage is also a member of the Simmons Center for Cancer Research, which contributed significant research to the development of Celebrex. The Trust argues that Professor Savage knows that if the arbitrators required BYU to pay the Trust, BYU's Department of Chemistry and Biochemistry or the Simmons Center for Cancer Research would have less money to pay research stipends and scholarships to Professor Savage and his students.[16]

The Supreme Court last interpreted "evident partiality" in *Commonwealth Coatings Corp. v. Cont'l Cas. Co*,[17] a plurality opinion. As a result of the differing interpretations contained therein, circuit courts have split on the appropriate standard.[18] Although the exact articulations differ, circuit courts generally fall into one of two camps: some give more weight to

---

[15] Docket No. 374, at 7 (SEALED).

[16] *Id*. at 8–10 (SEALED).

[17] 393 U.S. 145 (1968). Justice Black wrote "arbitrators [must] disclose to the parties any dealings that might create an impression of possible bias," and that arbitrators "not only must be unbiased but also must avoid even the appearance of bias." *Id*. at 149, 150. Justice White wrote that even where "the business relationship . . . be so insubstantial that to make a point revealing it would suggest [the arbitrator] is indeed easily swayed, and perhaps [is] a partisan of that party," "no such imputation [of partiality] can arise." *Id*. at 151 (White. J., concurrence). He concludes that disclosure must occur only where "the arbitrator has a substantial interest" in a party before the panel. *Id*.

[18] *See Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281–82 (5th Cir. 2007) (describing the circuit split).

Justice Black's broader plurality opinion, while a majority give more weight to Justice White's narrower concurrence.[19]

"The Tenth Circuit follows the majority, and has adopted a version of the 'actual bias standard.'"[20] In *Ormsbee Dev. Co. v. Grace*,[21] the Tenth Circuit held that "only clear evidence of impropriety . . . justifies the denial of summary confirmation of an arbitration award."[22] Specifically, "[f]or an award to be set aside, the evidence of bias or interest of an arbitrator must be direct, definite[,] and capable of demonstration rather than remote, uncertain, or speculative."[23] Notwithstanding the various interpretations, there is general agreement that mere appearance of bias is insufficient to establish evident partiality.[24]

---

[19] *See e.g., Morelite Const. Corp. v. N.Y.C. Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984) (holding that evident partiality is established "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration"); *Schmitz v. Zilveti*, 20 F.3d 1043, 1047 (9th Cir. 1994) (holding that evident partiality is established where there is a "reasonable impression of partiality").

[20] *Amicorp Inc. v. Gen. Steel Domestic Sales, LLC*, No. CIV. 07-CV-01105-LTB, 2007 WL 2890089, at *4 (D. Colo. Sept. 27, 2007), *aff'd*, 284 F. App'x 527 (10th Cir. 2008).

[21] 668 F.2d 1140 (10th Cir. 1982) (citation omitted).

[22] *Id*. at 1147.

[23] *Id*. (citing *Tamari v. Bache Halsey Stuart, Inc.*, 619 F.2d 1196, 1200 (7th Cir. 1980), *cert. denied*, 449 U.S. 873 (1980)). Some district courts in the Tenth Circuit have also described the standard as being where "a reasonable person would have to conclude that the arbitrators were partial to one party to the arbitration." *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 321 F. Supp. 2d 1214, 1223 (D. Kan. 2004) (internal quotation marks and citation omitted).

[24] *Morelite*, 748 F.2d at 83–84 ("[W]e read [evident partiality] as requiring a showing of something more than the mere 'appearance of bias' to vacate an arbitration award."); *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 621 (7th Cir. 2002) ("[O]nly *evident* partiality, not appearances or risks, spoils an award."); *Toyota of Berkeley v. Auto. Salesman's Union, Loc. 1095, United Food & Com. Workers Union*, 834 F.2d 751, 755 (9th Cir. 1987), *amended*, 856 F.2d 1572 (9th Cir. 1988) ("[T]he appearance of impropriety, standing alone, is insufficient to establish bias," and "the burden of proving specific facts indicating improper motives rests on the party challenging the arbitration award."); *Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987) (concluding the same).

Mindful of the "great caution" courts should exercise when asked to vacate an arbitral award, the Court finds that the Trust has failed to establish evident partiality. First, the Trust's argument that the arbitrators were evidently partial because they are employed by BYU is mere speculation of possible bias and is not direct nor definite. Certainly, the arbitrators all being current faculty may create an appearance of bias, but appearance is insufficient, for the bias must be evident and capable of demonstration.[25] The Trust provides no evidence, such as statements or conduct, that would create "circumstances . . . powerfully suggestive of bias."[26] Moreover, this Court already held that "hav[ing] a link to BYU" as current members of BYU faculty is not "evidence of likely bias—only assertion,"[27] and that "[t]he Trust fail[ed] to point to any actual evidence [of bias], only argument."[28] While the Trust here also highlights Dr. Savage's connection to the Department of Chemistry and the Simmons Center for Cancer Research, such is also insufficient to establish evident partiality because it amounts to mere speculation of bias based on appearance.

Second, the Trust cites several cases in which courts vacated arbitration awards and argues that the relationships at issue here are more direct than those courts have found sufficient to establish evident partiality. However, these cases contain materially different facts than those present here—namely, the arbitrators found to be partial all had *undisclosed* and repeated business dealings, or close familial relationships with a party before the arbitration panel.[29]

---

[25] *See JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Loc. 103*, 324 F.3d 42, 52 (1st Cir. 2003) ("The mere fact that the panel included business rivals of one party does not rise to the level of evident partiality.").

[26] *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681 (7th Cir. 1983).

[27] Docket No. 368, at 4 (citation omitted).

[28] *Id.*

[29] *See e.g., Commonwealth*, 393 U.S. at 146 (finding evident partiality where a "supposedly neutral [arbitrator]" had "repeated and significant" undisclosed business dealings

Here, by contrast, the arbitrators' institutional ties to BYU were fully disclosed and known to all parties from the beginning, and in that sense, the Parties contractually waived neutrality to the extent that the arbitrators would be "knowledgeable members of the University community." "The FAA reflects the fundamental principle that arbitration is a matter of contract," and "requires courts to enforce them according to their terms."[30] Accordingly, "[p]arties are free to choose for themselves to what lengths they will go in quest of impartiality. [The FAA] just states the presumptive rule, subject to variation by mutual consent."[31] Thus, "[i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed."[32]

In *National Football League Management Council v. National Football League Players Association*,[33] a matter colloquially known as "Deflategate," a player in the National Football League ("NFL") sought to vacate an arbitration award on the grounds of evident partiality. Under the NFL's collective bargaining agreement in effect at the time, the commissioner was empowered to take disciplinary action against any player whom he "reasonably judge[d]" to

---

with a party before the panel); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 160 (8th Cir. 1995) (finding evident partiality where an arbitrator failed to disclose "his high ranking positions" within a firm that had an "ongoing business relationship[]" with a party before the panel); *Schmitz*, 20 F.3d at 1048–49 (finding evident partiality where an arbitrator failed to investigate and disclose his law firm's prior representation of a parent company of a party before the panel); *Morelite*, 748 F.2d at 84–85 (finding evident partiality in an arbitrator whose father was vice president of a party before the panel).

[30] *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

[31] *Sphere Drake Ins. Ltd.*, 307 F.3d at 620.

[32] 9 U.S.C. § 5; *see Commonwealth*, 393 U.S. at 151 (White, J., concurrence) ("The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.").

[33] 820 F.3d 527 (2d Cir. 2016).

have engaged in detrimental conduct.[34] A player subjected to such discipline was entitled to appeal and to seek an arbitration hearing, and the commissioner could appoint either himself or a third party to serve as arbitrator. There, the player was disciplined upon the decision of the commissioner, appealed the decision, and sought an arbitration hearing. The commissioner chose himself as the arbitrator and upheld the disciplinary action. Among other reasons, the disciplined player sought to vacate the decision arguing it was improper for the commissioner to adjudicate the propriety of his own conduct and he should have delegated his authority to a neutral third party.

The Second Circuit, however, disagreed. It found that the parties contracted to specifically allow the commissioner to sit as the arbitrator in such disputes, and did so "knowing full well that the [c]ommissioner had the sole power of determining what constitutes 'conduct detrimental,' and thus knowing that the [c]ommissioner would have a stake both in the underlying discipline and in [the related] arbitration."[35] It concluded that "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."[36]

So too here, Dr. Robertson agreed to the Policy and invoked it as the basis for his breach of contract claim and thus had full knowledge that the arbitration panel would be made up of "knowledgeable members of the University community." Therefore, the arbitrators' institutional ties to BYU as members of the University community, including any connections that reasonably flow therefrom, alone, cannot be the basis for finding evident partiality because the parties

---

[34] *Id*. at 537.

[35] *Id*. at 548.

[36] *Id*. (citations omitted); *see also Merit Ins. Co*, 714 F.2d at 679 (concluding the same) (internal quotation marks and citation omitted).

contractually agreed to arbitration conducted by persons with those institutional ties, and thereby waived neutrality to that extent. The Trust provides no case law or other authority that suggests otherwise.[37] Put differently, finding evident partiality solely on the basis of the arbitrators' institutional affiliations with BYU, where such affiliation inheres in the method agreed to, would effectively result in the Court rewriting the Parties' agreement and would render meaningless the principle that arbitration is a matter of contract.[38]

The Trust agrees that the 1992 Policy is a valid contract, and that Mr. Robertson agreed to be bound thereby, but raises two additional arguments. First, it argues that Mr. Robertson never agreed to be bound by "University community" as interpreted to mean "current faculty, staff, and students." Second, the Trust argues that the Dispute Resolution Clause does not "delegate" authority to BYU or former Utah Supreme Court Justice Thomas Lee to "decide threshold questions of arbitrability," including the process for selecting arbitrators.[39] It argues that threshold arbitration questions are for judicial determination unless the parties clearly and unmistakably provide otherwise.

The Policy provides that "[t]he arbitration process will be conducted in a fair manner in consultation with the Office of General Counsel as to procedure."[40] The OGC had access to Justice Lee as "a neutral and knowledge legal resource."[41] Justice Lee provided the Panel "with

---

[37] *But see Commonwealth*, 393 U.S. at 150 (White, J., concurrence) ("[A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance.").

[38] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1152 (10th Cir. 2000) ("[T]he court's duty is to interpret and enforce contracts as written between the parties, not to rewrite or restructure them.") (internal quotation marks and citation omitted).

[39] Docket No. 371, at 7–8.

[40] Docket No. 369-1, at 8.

[41] *Id*. at 9.

insight into legal terminology and procedure."[42] During the selection of arbitrators, a dispute arose regarding the proper interpretation and scope of "University community." Justice Lee, and by extension the Panel, rejected both the Trust's and BYU's proposed definitions and instead interpreted that term to mean "current faculty, staff, and students."

Contrary to the Trust's argument, the issues on which Justice Lee advised the Panel on behalf of the OGC are not threshold questions of arbitrability. "Interpretation of the arbitration agreement, including any rules of arbitration therein, is the province of the arbitrator."[43] This includes "question[s] of contract interpretation."[44] Additionally, although the Trust is correct that Dr. Robertson agreed to the Policy prior to the interpretation of "University community," the Trust's argument still fails. The term "knowledgeable members of the University community" necessarily implies that potential arbitrators will have some institutional affiliation to BYU, which could include employment; and it is a well-established principle of contract interpretation that a party to an agreement is bound by the reasonable interpretation of an ambiguous term contained therein.

Lastly, the Trust argues that Justice Lee's interpretation of "University community" was unconscionable. This argument was previously raised and rejected by the Court, and the Court does so again for the same reasons discussed there.[45]

---

[42] *Id.*

[43] *Universal Oil & Gas LLC v. Am. Arb. Ass'n, Inc.*, No. 1:22-CV-03195-DDD-SKC, 2023 WL 11920618, at *4 (D. Colo. Dec. 15, 2023) (citing *Mid Atl. Cap. Corp. v. Bien*, 956 F.3d 1182, 1207 (10th Cir. 2020)).

[44] *Mid. Atl. Cap. Corp.*, 956 F.3d at 1207.

[45] *See* Docket No. 368, at 4 (finding that the Dispute Resolution Clause was not unconscionable because BYU did not have "exclusive control" over the pool of potential arbitrators that consisted of more than 40,000 persons, and that having a link to BYU through employment, alone, is not evidence of likely bias, only assertion).

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Brigham Young University's Motion to Confirm Arbitration Decision and Motion for Judgment on the Pleadings for Entry of Final Judgment (Docket No. 369) is GRANTED. It is further

ORDERED that the Robertson Trust's Motion to Vacate Arbitration Award (Docket No. 372) is DENIED. It is further

ORDERED that the *Arbitration Decision in the Matter of Donald L. Robertson Trust v. Brigham Young University*, December 12, 2025 (Docket No. 369-1), is CONFIRMED. It is further

ORDERED that Brigham Young University disburse any funds consistent with the Arbitration Decision.

DATED this 14th day of September, 2026.

BY THE COURT:

TED STEWART
United States District Judge